86 530
e112 897

CASE 71—PETITION EQUITY—JANUARY 14.

# Jones, Assignee, &c., v. Johnson, &c.
# Emory's Sons v. Traders' Bank and Warehouse Co., &c.

APPEALS FROM LOUISVILLE CHANCERY COURT.

1. BANKS—DUTIES AND LIABILITIES OF DIRECTORS.—The directors of a corporation, or a president who is a mere figure-head of the institution and does not receive sufficient salary to compensate him for devoting his entire time and attention to its business, are liable only for gross neglect in the management of the affairs of the corporation, in the absence of fraud.

   The directors of a bank were not chargeable with gross neglect in discounting paper which they had every reason to believe was good,. although it turned out to be worthless; nor in allowing the cashier, who was regarded as solvent, to overdraw his account, it appearing that such overdrafts, when not too large, are not unusual with those connected with such institutions, the directors in this case having no reason to believe that the cashier was drawing such large sums of money as was afterwards discovered.

2. SAME.—The directors of the bank had the right, in their discretion, to allow the cashier, after he had been removed from that position, compensation to which he was not entitled, in order to obtain a settlement and secure what he owed the bank on account of overdrafts.

3. SAME.—The stockholders cannot complain of the fact that the cashier, after he was removed from that position, was elected a director, as it does not appear that any damage or injury resulted from his appointment as director...

4. SAME—CONDITIONAL SALE OF STOCK.—A purchaser of stock executed his note therefor, stipulating that the certificate of stock should be received by the bank in discharge of the note if he should so elect, that being the condition of the purchase. Held—That the contract. was binding on the bank, and the stock having been received by the bank in discharge of the note, the stockholders can not complain.

5. COMPENSATION OF OFFICER BY SURRENDERING NOTE FOR STOCK.—The directors had the right to surrender to an officer of the bank his note executed for stock, in discharge of his claim for services, the value of his services exceeding the amount of the note, and the validity of his claim not being questioned.

6. PURCHASES OF STOCK BY DIRECTORS in their own names, although done to sustain the credit of the bank, should be enforced.

Jones, Assignee, &c., v. Johnson, &c.

7. SAME—PRIORITY OF CREDITORS OVER STOCKHOLDERS.—The board of directors of a bank, by resolution, authorized the president and cashier to issue to the latter four hundred shares of stock in consideration of his two notes for twenty thousand dollars each, the resolution reciting that the purpose was to enable the cashier to borrow money on the stock as collateral, for the use of the bank, and that the bank would "take care to protect him in the transaction." The stock was issued to the cashier and money borrowed by him from E.'s Sons, the stock being pledged as collateral. The money thus obtained by him was deposited in the bank to his credit, less the discount, which was restored to him. In this action by the stockholders of the bank for a settlement and distribution of the bank's assets, in which E.'s Sons appeared and sought to make the bank liable as their debtor, and the directors personally liable on the ground of fraud, *Held*—That whether the stock was sold to enable the cashier to raise money to pay his debt to the bank, or for the purposes of the bank, it is apparent that the bank resorted to this means of raising money for its own benefit, and, therefore, E.'s Sons have the right as creditors of the bank to priority over stockholders.

8. JOINDER OF ACTIONS.—The right of action against the directors, if any existed, was purely in tort, and could not be joined in the suit by stockholders to settle the affairs of the insolvent bank, or by creditors to enforce their contracts.

9. PRINCIPAL AND AGENT.—Where an agent deals with another without disclosing his agency he is personally liable, as is also the principal, but the liability is not joint, and the creditor may relieve the principal by electing to look alone to the agent, after the fact of the agency has been discovered. But whether there has been such an election is a question of fact which is not determined by the mere act of charging the agent after knowledge of the principal.

In this case an election had been made, and an action was progressing in which the creditors were seeking to make the real principal liable, when the creditors filed their claim in an action for the settlement of the agent's estate, which was insolvent; and received a small *pro rata* thereon. *Held*—That it would be unreasonable to hold, as a matter of law, under such a state of facts as exists in this case, that the right to pursue the principal was lost, and that the creditors intended to look alone to the agent's estate for their money.

L. M. DEMBITZ FOR APPELLANTS.

1. The directors unlawfully surrendered various stock notes of solvent subscribers, taking back the stock certificates; and they are liable to plaintiffs for the amount lost to the bank thereby.

2 The defense that the notes of Wm. Johnson were returned to him, as extra compensation for his services as assistant cashier and warehouse-

Jones, Assignee, &c., v. Johnson, &c.

man, does not deserve consideration. The facts show that such was not the case. But even if so, it does not appear that they were trying to reward "zeal and merit;" and in that event only would they have been justified in allowing extra compensation. (Percy v. Millandon, 8 Martino's La. Rep. (N. S.), 68; Goldbold v. Branch Bank of Mobile, 11 Ala., 190, 199.)

3. The directors are liable for the dividend tax paid to the United States on an unearned dividend fraudulently declared by them.

4. The directors are liable for the loss resulting from allowing Dorn to continue to act as cashier after they had actual knowledge of his dishonest acts, which they attempted to conceal. (Charitable Corporation v. Sutton, 2 Atkyns, 400; Millandon v. Percy, 3 La. (O. S.), 568; Smith v. Robinson, 3 Paige, 231.)

5. All the directors who participated in any wrongful act are jointly liable for the loss resulting therefrom. The law does not apportion the liability. (Charitable Corporation v. Sutton, 2 Atkyns, 400; Franklin Ins. Co. v. Jenkins, 3 Wend., 130.)

6. The act of Dorn in lending the bank's money (seventeen thousand dollars) to himself upon worthless security was a simple act of embezzlement; and as this loss resulted from the negligence of the directors in allowing Dorn to continue to act as cashier, after they knew of other dishonest acts, they are liable therefor.

7. The directors having canceled the cashier's bond without authority to do so, are liable for whatever the sureties in that bond would have been liable for. And the directors, having destroyed the bond and failing to show who the bondsmen were, and what the penalty was, will be held as if the bondsmen were good and the penalty sufficient to cover the cashier's delinquencies.

8. The directors illegally issued to Dorn twenty thousand dollars in stock for eighteen thousand five hundred and seven dollars and sixty-two cents, thus making themselves responsible for the difference.

WM. REINECKE on same side.

JAMES SPEED for EMORY'S SONS, appellants.

1. The bank is liable to Emory's Sons as a tort-feasor. The money was obtained by the bank from them by artfully contriving to conceal the truth, and flatly affirming a falsehood.

2. The fact that the Emorys have sued Dorn on his notes and collected a part of them does not release the bank. Dorn was bound upon his contract, and the bank is liable upon its fraud. There were too separate and distinct legal injuries, each resulting in damage. Either and both injuries are discharged when that damage is paid, but neither is satisfied until the damage is paid. (Pasley v. Freeman, 2 Smith's Leading Cases; United Society of Shakers v. Underwood, 11 Bush, and authorities there cited.)

3. It was not competent for the directors to make such a contract as that set up between the bank and Scott.

THOMAS SPEED ON SAME SIDE.

Dorn acted for the bank in borrowing money from Emory's Sons, and, therefore, the bank is liable to them.

J. S. PIRTLE ON SAME SIDE.

1. Everybody that participated in the contrivance by which the money was obtained from Emory's Sons, and every one who received the benefit of the money obtained, is liable to them. Our claim is good against the directors, the bank, and through the bank against stockholders indebted to the bank, and against Dorn's estate also on his notes. (Underwood v. Shakers, 9 Bush; S. C., 11 Bush, 268; Angell and Ames on Corporations, sec. 387.)

2. Appellants by proving their claim against Dorn's estate did not elect to look to Dorn alone and release the bank. The bank, Dorn and the directors were guilty of a fraud upon appellants, and there is no election in such a case to look to one of several joint trespassers and release the others by the prosecution of the claim against one.

3. But regarding the bank and Dorn merely as principal and agent, the doctrine of election as between principal and agent does not apply.

Where an agent acts for an undisclosed principal, the creditor on discovery of principal may sue either principal or agent And while the creditor who intelligently elects to look to the agent alone can not afterwards recover against principal, merely proceeding against the agent is not such election. In order to relieve the principal there must be something equivalent to an election *not* to charge the principal. (Wharton on Agency, section 464, etc.; *Ibid.*, sections 470-472; Coleman v. Bank, 53 N. Y., 388, 397; Garrard v. Moody, 48 Ga., 96; Calder v. Dobell, L. R., 6 C. P., 466; Curtis v. Williamson, L. R., 1 Q. B., 57; Fowler v. Hollins, L. R., 7 Q. B., 616; 2 Kent, 631, and note; Story on Agency, sections 266-270; *Ibid.*, section 291; Thompson v. Davenport, 2 Smith's Leading Cases, 358; Bate v. Burr, 4 Harrington, 130; Rankin v. De Forrest, 18 Barb., 143; Smith v. Anderson, 7 C. B., 21; French v. Price, 24 Pick., 13; Page v. Stone, 10 Met., 160; Jones v. Ætna Insurance Co., 14 Conn., 501; Claland v. Walker, 11 Ala., 1058; Raymon v. Crown & Eagle Mills, 2 Met. (Mass.), 319; Upton v. Gray, 2 Greenleaf, 373.)

4. The act of the directors in cancelling the note of Horace Scott for fifty thousand dollars, executed for one thousand shares of stock, was void, and as to appellants Horace Scott is still a stockholder; and, as the holder of stock not fully paid for, liable to be compelled to contribute to the payment of appellants' claim if it be necessary to enforce payment from stockholders to satisfy that claim.

Jones, Assignee, &c., v. Johnson, &c.

The governing officers of a corporation can not release a stockholder from his obligation to pay, to the prejudice of its creditors, except by fair and honest dealing, and for a valuable consideration. (Burke v. Smith, 16 Wall., 390, 395; Sawyer v. Hoag, 17 Wall., 610, 620; Castleman, &c., v. Holmes, 4 J. J. M., 6 and 7; Roman, &c., v. Fry, 5 J. J. M., 635; Ogilvie v. Knox Insurance Co., 22 How., 380; Dudley v. Price's Administrator, 10 B. M., 86; Upton, Assignee, v. Trebelcock, 1 Otto, 45; Sanger v. Upton, Assignee, Ibid., 60; Morse on Banking, page 426, etc.; Brigham v. Mead, 10 Allen, 245; Buffalo City R. R. Co. v. Dudley, 14 N. Y., 336; Seymour v. Sturges, 26 N. Y., 134.)

The subterfuge of an agreement between the subscriber and the directors that no payment shall be demanded, or that a note given shall not be collected, is never allowed to prevail against creditors. (Tuckerman v. Brown, 33 N. Y., 303; Brown v. Appleby, 1 Sandf., S. C., 158; Ibid., 629; Palmer v. Lawrence, 3 Sandf., S. C., 161.)

GEORGE M. DAVIE for APPELLEES.

1. In an action by stockholders against directors for negligence or malfeasance, the petition must set forth separately and with particularity the different items and instances intended to be relied upon. General charges will not do; and the court will not consider the evidence as to any but the items specifically alleged. (Franklin Insurance Co. v. Jenkins, 3 Wendell, 134.)

2. The acts and omissions charged against the directors are either unproven, or are shown to have been free from any fraudulent or improper intent, and to have occurred only from lack of superior banking knowledge or from mistakes of judgment. Directors acting without compensation are only required to observe such care as gratuitous directors ordinarily exercise, and are not liable for mistakes of judgment, however absurd or disastrous they may have turned out to be. (Thompson on Liability of Officers and Agents of Corporations, 357; Spering's Appeal, 71 Pa. St., 24; Kyle v. Dunn, 14 Bush, 137; Turquand v. Marshall Law Reports, 5 Ch'y Appeals, 386.)

3. The fact that the cashier, Dorn, made overdrafts and allowed others to make them, even if known to the directors, is not actionable. The allowance of overdrafts is so customary in banking as to raise no implication of negligence or malfeasance. (Commercial Bank v. Ten Eyck, 48 New York, 310.)

4. It was not negligence or malfeasance for the directors, as soon as they discovered the large overdrafts and other misappropriations of the cashier, to remove him from office and to make a settlement with him by which his debt was largely secured by mortgages. Such a settlement was prudent, and was within the legal powers of the directors. (Frankfort Bank v. Jones, 24 Maine, 502.)

5. The directors having in good faith permitted the cashier to receive for discount paper of parties who were of questionable solvency, but whom the directors believed at the time to be solvent, they are not liable for the losses occasioned by such mistakes of judgment. (Kyle v. Dunn, 14 Bush, 137.)

6. The charter left it discretionary with the directors as to requiring bond from the cashier, and they did not deem it necessary, inasmuch as the cashier was the originator and absolute manager of the bank and the owner or controller of the greater part of its stock, and was believed to be of great wealth and integrity. And if a bond had been taken it would have amounted to nothing, as the settlement by taking the mortgages would have released the sureties. (Morris Canal Co. v. Van Vorst, 1 Zabriskie, 100.)

7. It was prudence and not malfeasance for the directors to afterwards elect the cashier a director, and to otherwise "nurse" his credit and reputation until the six months had elapsed within which the mortgages he has given might have been attacked as preferences; and it was prudent and not malfeasance to allow him credit for his salary as cashier, as a means of keeping him in good feeling towards the bank during those six months of danger. (Goldbold v. Branch Bank, 11 Ala., 191; Franklin Bank v. Jones, 24 Maine, 502.)

8. It was not culpable in the directors not to enforce the conditional stock subscription of Horace Scott. It was not enforceable because the condition was not performed. A subscription made, not as a part of the original organization, but afterwards, may be made on conditions, and such conditions, even if not enforceable against creditors, are enforceable as against the bank and its stockholders. (Caley v. Phil. R. R., 80 Pa. St., 363; R. R. v. Stewart, 41 Pa. St., 54; McMillen's Case, 15 B. Monroe, 218; Leavell's Case, 16 B. Mon., 364; Lackey's Case, 17 B. Mon., 51.)

9. Nor are the directors liable for allowing Wm. Johnston a salary as superintendent, and applying it to pay his subscription to stock. An erroneous exercise of judgment by the directors, by which a salary is paid where none was really due, does not render them liable. (Goldbold v. Branch Bank, 11 Ala., 191.)

10. The action of the directors in trying to keep up the credit of the bank and the price of its stock during its six months of peril, by forming a pool, buying its stock when publicly offered for sale, and then turning it over to the bank at the prices they bought it for, was in pursuance of their judgment as to what was best for the bank's interests; and, while, perhaps, poor banking, was not actionable. (Kimmel v. Stoner, 18 Pa. St., 155.)

11. As to the cross-petition of Emory's Sons against the directors for damages for negligence, they sue as creditors of the bank; and their suit

cannot be joined with this suit by the stockholders. (Code, section 83.)

12. A creditor of a corporation cannot sue its directors for the loss he may have sustained by reason of their having wasted its assets by fraud or negligence. Such action can only be by the corporation or its stockholders. (Branch v. Roberts, 50 Barbour, 435; Scott v. Roberts, 34 How., Pr. R., 185; Winter v. Baker, 35 How., Pr. R., 183.)

13. Emory's Sons cannot sue the directors for negligence or fraud which occurred prior to the time they purchased the stock. (Mabey v. Adams, 3 Bosworth, 346.)

14. If Emory's Sons are to be considered as having made a loan to the bank as an undisclosed principal, through Dorn its agent, still they could not hold the bank after taking judgment for their claim against Dorn and collecting part of their debt from Dorn's estate. One who has elected to take judgment against the agent cannot afterwards claim against the undisclosed principal; even though he did not know there was a principal at the time he took the judgment against the agent. (Priestly v. Fernie, 3 Hurl. & Colt., 977; Colder v. Dobell Law Reports, 6 Com. Pl., 499; Curtis v. Williamson, L. R., 10 Q. B., 60; Jones v. Ætna Co., 14 Conn., 508; Saunderson v. Lamberton, 6 Binney, 129; Smithhurst v. Mitchell, 1 Ell. & Ell., 630; Kingley v. Davis, 104 Mass., 179; Paige v. Stone, 10 Met., 169; Ahrens v. Cobb, 9 Humphreys, 645; Violett v. Powell, 10 Ben. Mon., 349.)

15. An election to look to the agent and not to the undisclosed principal is presumed to have been made with knowledge of the facts. (52 N. Y., 277; 20 Cal., 602.) And the facts only, and not the legal effect of the facts, are necessary to be known to make an election binding. (Hanks v. Drake, 49 Barbour, 202.)

16. A director is not liable for the frauds of the directory unless he personally sanctioned or participated in them. (Arthur v. Griswold, 55 New York, 406; Wakeman v. Dalley, 51 New York, 27; Ashurst v. Mason Law Reports, 20 Equity, 225.)

R. W. WOOLLEY, I. & J. CALDWELL & WINSTON, P. B. MUIR. AND CHARLES H. GIBSON OF COUNSEL ON SAME SIDE.

CHIEF JUSTICE PRYOR DELIVERED THE OPINION OF THE COURT.

A number of defendants in this case having made motions to dismiss this action on account of a misjoinder and for other causes, the action was dismissed by a judgment below, that on an appeal to this court was reversed, and will be found reported in 10 Bush, page 649. (Jones, Assignee, &c., v. Johnson, &c.)

The action was instituted by stockholders of the Traders' Bank and Warehouse Company, to compel its assignee, Ullman, to settle the business of the corporation and distribute its assets, and to make the president and directors of the bank liable for the negligent manner in which they had managed its affairs. By an answer and cross-petition, Thomas Emory's Sons set up a large claim against the corporation, asking a judgment for the amount against it, and that the stockholders be compelled to pay up their stock for its satisfaction.

The court below adjudged that Emory's Sons were not creditors of the bank, and dismissed their complaint, from which they have appealed. It was also adjudged that the directors were not liable to the stockholders by reason of any neglect of duty, and from that judgment the stockholders have appealed.

The organization of the Traders' Bank and Warehouse Company, as well as the subscription to its capital stock, was mainly due to the personal exertions and influence of Julius Dorn, its cashier, who was supposed to be a man of much wealth, and regarded as possessing the highest order of personal as well as business integrity. His father-in-law, Nuernberger, had retired from business, owning, as was supposed, a large estate, and was indorsing and sustaining Dorn in all of his business transactions.

James Johnson was made president of the bank, and his co-appellees, Thierman, Clifton, Chase, Hecht, etc., were the directors. They seem, from the facts before us, to have been inexperienced in the business of banking. Dorn was elected cashier by reason of his superior

business qualifications, and for the additional reason, no doubt, that himself and his father-in-law owned more than one-half of the stock subscribed.

The stockholders and directors were looking to Dorn as the medium through which the enterprise was to be made a success. A great deal of the stock taken had not been paid, but notes executed for ·the amount by the stockholders, under the belief that one-half of the amount subscribed would soon be paid in dividends. Some forty thousand dollars of ·stock taken by Dorn was paid for in real estate, or at least that much was unproductive capital.

Dorn, as cashier, seems to have had almost the complete control of the bank, and the directors, having the utmost confidence in his integrity as well as his pecuniary ability to meet all of his engagements, were not vigilant in the examination of his accounts with the bank, and within less than a year he had become largely indebted to it, and, in fact, had wrecked the entire enterprise.

· The corporation having assigned to Ullman, and Ullman declining to sue the directors for their alleged neglect of duty, the stockholders, or a portion of them, instituted this action, charging:

First. That the directors, knowing Dorn to be insolvent, allowed him to largely overdraw his deposit account, and with a full knowledge of the facts permitted him to take cash ou'' of the teller's drawer and apply it to his private use, he placing his tickets in the drawer showing the amount taken, and the directors counting those tickets as cash.

Second. They had discounted Dorn's paper for large

amounts when they knew it was not good and the parties to it insolvent, and had permitted insolvent parties to overdraw their respective accounts, and had afterwards accepted Dorn's check for these overdrafts.

Third. That the directors had canceled the bond of Dorn executed as cashier, and released his sureties.

Fourth. That the directors had sold to Dorn four hundred shares of stock and took his note therefor, and when he paid in twenty thousand dollars on his notes they made him a present of, or permitted him to check out, one thousand four hundred and ninety-two dollars and thirty-two cents of the amount.

Fifth. They elected him a director after he was removed as cashier, and had paid him his salary as cashier when he was entitled to nothing.

Sixth. That the directors, after settling with Dorn and his father-in-law for his overdrafts, had permitted Dorn to check out the balance said to be due him on settlement.

Seventh. That they had released certain stockholders, Horace Scott and Wm. Johnson, from the payment of their stock subscribed.

Eighth. That the directors, except Chase, drew from the bank various sums amounting to four thousand three hundred and forty-four dollars, for their own use, and surrendered worthless stock therefor.

Other charges of mismanagement and neglect are made not necessary to be considered, as those enumerated, and more specifically alleged as to amounts and dates than here stated, embrace the principal subjects of controversy.

This corporation was organized in September, 1871,

and in March, 1872, it was discovered that the balanced books showed an indebtedness by Dorn of near forty thousand dollars. Dorn was then removed as cashier and a settlement demanded, resulting in the execution of the notes of Dorn and his father-in-law for the amount of this indebtedness, and secured by a mortgage on real estate then of ample value to satisfy the indebtedness.

That Dorn had at times drawn more than his deposit account was a fact known to the directors, his account showing at times credits to Dorn by way of deposit of more than he had drawn out, and at other times an amount exceeding his deposit account, but that he had overdrawn so largely was a fact unknown to the directors until March, 1872. It is shown by Johnson, the president, that when the committee appointed for that purpose investigated the condition of the bank and the accounts of the cashier, they found the money always on hand and no tickets accepted as cash; that the accounts were proper, and no reason existed for the belief that Dorn was betraying the confidence of the directors, or withdrawing such large sums of money. It appears that Dorn was a commission merchant, engaged in the purchase and sale of whisky, and when his account was overdrawn, he gave as a reason that he was then engaged in settling up his commission business with a view of closing his house, and required more funds than he otherwise would, as he was compelled to pay out, and was making few collections. He was then regarded as amply able to meet all his engagements, and his solvency not doubted by any of the directors and but by a few business men. He and

his father-in-law owned a majority of the stock, and overdrafts that were not too large were not unusual, as the evidence shows, with those connected with such institutions, if regarded as solvent. An exercise of the utmost vigilance might have produced different results, but this was not required of the directors; but when they did discover the condition of Dorn's accounts, and that practices had been resorted to by him in order to deceive, they obtained the settlement and the mortgage to secure this indebtedness. Several of these appellants who were stockholders in common with the officers of the bank had been permitted to overdraw their deposit accounts, and now complain of the directors for permitting the cashier to do the same thing. But it is evident that the directors secured the bank and its stockholders for every dollar that Dorn had overdrawn by the mortgages executed to secure the notes of the latter and those of his father-in-law given in settlement of this claim.

So it is needless to discuss this branch of the case further than to show the confidence of these trustees, who were representing the stockholders, in the cashier, Dorn, and their belief in his ability to pay his entire indebtedness, indulged almost to the moment of time at which the corporation was declared to be insolvent. Their only remedy was in a settlement with the cashier, and to secure as much as possible the amount of his indebtedness. This they seem to have done in good faith, and to protect the bank regardless of the rights of others.

It is proper to notice next the character of paper discounted by the bank for the benefit of Dorn. It is

alleged that the parties to the paper were insolvent, and known to be so by the directors, and if the facts proven establish the charge made, they are no doubt liable. This controversy between the stockholders and directors renders it proper to determine the question of diligence to be exercised by the directors in the control of the bank, its officers and business. Thompson in his work on Liability of Officers of Corporations, says that "directors of a corporation are not liable to the corporation for mistakes of judgment, however disastrous such mistakes may be. In all these cases the question is: Have directors been guilty of negligence of a gross and flagrant character?"

Every case must depend necessarily on the facts and circumstances surrounding it, and here it is plain that Dorn, Caldwell, Chambers & Co. and Chamberlain, Dorn's indorsers, were believed to be perfectly solvent when the paper was originally discounted. The testimony of Chambers would confirm that belief, and the directors, in the exercise of a discretion that must necessarily pertain to the exercise of their power, saw proper to discount the paper. That it turned out to be worthless is not sufficient of itself to convict the directors of gross neglect in discounting it; but, on the contrary, they had every reason to believe that Dorn's name made it desirable paper. There is no fraud shown or combination between the directors and Dorn to defraud the bank, or any fact tending to establish neglect, except the implicit confidence they had in Dorn's financial ability and personal integrity; and so far as the discount of his paper is concerned, although worthless, these directors are not liable.

That a higher degree of vigilance is to be required of the president of a bank whose salary for a general supervision of its affairs is sufficient to compensate him in devoting his entire time and attention to its business, may be conceded; but directors who receive no compensation, or a president who is the mere figure-head of the institution, are liable for only gross neglect (in the absence of fraud) in the management of the corporation, and this rule must certainly apply when stockholders are attempting to make them liable.

It is further urged that after Dorn was removed as cashier he was elected a director of the bank, and that he was allowed pay for his services when he was entitled to no compensation.   We find no damages resulting to the bank by reason of the position assigned Dorn after his removal as cashier; and when the directors attempted to make a settlement with him so as to secure his overdrafts, they saw proper to remunerate him that a settlement might be obtained.   This allowance was made in the exercise of a discretion that belonged to the directors.   It was done in good faith, and to protect the corporation.   They seem to have made an effort, as they swear, to reconcile Dorn, by making him a director, so as an exposure might not be made and suits under the act of 1856 instituted, under which, if the mortgages made by Dorn and his father-in-law had been assailed by creditors as a preference within six months, the bank would have lost the security, except in a *pro rata* distribution between all creditors; and if this reason should be regarded as not satisfactory, no injury or damage having resulted from

his appointment as director, the stockholders can not complain.

The appellants also complain that the directors released Horace Scott and Wm. Johnson from the payment of their stock subscriptions without any reason therefor, and in disregard of the rights of those interested with them.

After the organization of the bank, Dorn, the cashier, importuned Scott to take one hundred thousand dollars of the stock upon condition. The note he gave evidenced the terms of the contract, and that he had the option at a certain period of time to determine whether or not he would take the stock is conceded by the directors and shown by the notes of Scott executed for the stock, all of which were left, including the certificate of stock, with the bank. The note stipulated that the certificate should be received in discharge of the note. It was so received, and this ended Scott's connection with the bank. The contract was binding on the bank, and if so, the stockholders, who were in no manner misled by it, can not enforce the contract when the party (the corporation) they represent is bound by its terms.

As to the claim of Wm. Johnson for his services as superintendent of the warehouse, its validity not being questioned, the directors surrendered to him his note executed for stock in full discharge of the claim for services. The value of his services exceeded the value of his stock, and as between him and the other stockholders they can not complain.

The court below held that the stock issued to some of the directors for extra services should be canceled,

and further held that the shares of stock purchased by the directors in their own names, although done to sustain the credit of the bank, and for which they gave their individual notes, should be enforced, each director being liable to the extent of the stock purchased by him. In this conclusion we also concur.

A careful examination of this entire record, so far as it affects the rights of stockholders, leads to the conclusion that the board of directors acted in the best of faith, and while a careful and vigilant business man might have detected the fraudulent purposes of the cashier at an earlier date, still the financial standing of Dorn, connected with his business capacity, influenced the directors and stockholders to give him the control of an experiment in banking connected with the business of a warehouse, upon a limited capital that was constantly begging for additions to its capital stock, resulting in less than one year in a complete financial wreck. Those ordinarily careful in business transactions could not well have done more than these directors to protect the bank's interest, and preserve the rights of stockholders. Other charges of neglect of less importance than those noticed have been made, and were properly disposed of by the court below. No bond seems to have been executed by Dorn as cashier, although a resolution of the board shows that it was canceled. If, however, a bond had been executed, the settlement by the directors with the cashier included his liabilities as such, and would have released his sureties. His sureties would not have been liable by reason of the failure of Dorn to pay his notes discounted by the bank.

Whether or not the charter required the directors to take a bond is not a question raised, and if so, the settlement made in good faith by the directors extinguished Dorn's liability caused by the abuse of his official position.

A large number of the stockholders, who were among the original plaintiffs, disclaimed in open court the intention of making charges of bad faith and neglect against the directors before this action terminated in the court below, and those who made no such disclaimers, and must by their connection with the bank and the directors have been conversant with its management, have failed to testify. We find no bad faith or gross neglect on the part of the directors.

The question arising on the cross-petition of Emory's Sons is more difficult of solution than any other question in the case. These appellants maintain that the bank is liable to them for twenty thousand dollars, the money having been obtained from them by Dorn, its cashier, for the benefit of the bank. The money was loaned on the notes of Dorn with the stock of the bank pledged as a collateral, and without any knowledge at the time that the money borrowed was for the bank. The bank insists that it sold Dorn, through its directors, four hundred shares of its capital stock, and took from Dorn in payment his two notes for twenty thousand dollars each. That these notes were received in full payment of the stock, based on the belief by the directors that Dorn was perfectly solvent. He is charged with forty thousand dollars as the price of the stock, and credited by his two notes as cash for forty thousand dollars. The bank, through its president, then

certified that no lien existed on the stock to enable
Dorn to raise money on the stock by placing it as a
collateral with those of whom he obtained the money.
Armed with this certificate of stock, Dorn obtained
from Emory's Sons twenty thousand dollars, and left
with them a part of this stock as security for its pay-
ment.

It is evident that Dorn was either borrowing this
money for the bank or he was obtaining it to enable
him to satisfy his debts to the bank. The directors
say it was a sale of the stock and for a valuable con-
sideration, and not intended to raise money for the
bank. This they may have supposed, as they then had
the greatest confidence in Dorn's ability to pay; but
the manner of the sale to Dorn, as evidenced by the
resolution of the directors under which the alleged sale
of the stock to Dorn was made, and the subsequent
disposition of the money, negatives the idea that such
was the purpose of the directors ·or Dorn when the
alleged sale was made. The resolution passed by the
board of directors is as follows :

"It was moved and carried, that the president and
cashier be authorized to issue to Mr. Julius Dorn, four
hundred shares of Traders' Bank and Warehouse Com-
pany stock, in consideration of his two notes of twenty
thousand dollars each, dated October 20, 1871, payable
respectively in five and six months, with the under-
standing that when certificates for said stock, equiv-
alent in amount of either of said notes, are presented,
that the said notes shall be surrendered to Julius Dorn.
The purpose of this arrangement is to enable Mr. Dorn
to borrow money, on the deposit of said stock as collat-

eral, for the use of the Traders' Bank and Warehouse Company, which will take care to protect Mr. Dorn in the transaction." The money thus obtained was deposited by Dorn in the bank to his credit, less the discount that was restored to Dorn. Whether the stock sold was to enable Dorn to pay his debt to the bank or for the purposes of the bank, it resorted to this means of raising the money, all of which was for the benefit of the bank. The resolution shows plainly the object in view. It was not a conditional sale of stock, but a sale to Dorn to enable him to raise money for the bank, *and in this the bank agreed to protect him*. It is plainly written, and the deposit made by Dorn, with the discount returned to him, showing beyond doubt that Dorn was executing the original purpose of the resolution. Emory's Sons were either loaning this money to Dorn for the general use of the bank, or loaning it to the bank to enable Dorn to discharge his indebtedness to it. Emory's Sons were, it is true, dealing with Dorn alone, and were ignorant of the resolution when the loan was made; still this does not alter the liability of the bank. The loan was in fact for the benefit of the bank, and Emory's Sons became its creditors. The money arising from the pledge of this stock went into and formed a part of its assets.

The object of the resolution was to enable Dorn to borrow money on the deposit of the stock as collateral for the use of the bank and warehouse company, and Dorn was to be fully protected in his acts. Dorn had the authority to raise greatly more than his indebtedness by reason of this stock. With what was supposed to be his financial standing, as the proof con-

duces clearly to establish, he could have raised as much as the entire stock sold him, by pledging it as a collateral, and such was manifestly the intention when the resolution was adopted.

The money of Emory's Sons went into the bank at the instance of its directors, and for the purpose of increasing its assets, or to enable its cashier, by the pledge of the stock of the bank, to meet his liabilities; and when the fact was discovered by Emory's Sons they sought to make the bank liable as its creditor, and the directors personally liable on the ground of fraud.

They appeared in this action brought by the stockholders for a settlement and distribution of the bank's assets, and had the right as creditors to priority over stockholders. If they had a remedy against the directors it was for their tort in permitting the stock of the bank to be transferred to them in such a manner. Their liability was several and not joint, and no implied contract arose between them and Emory's Sons to save them harmless by reason of the power conferred on the cashier of the bank. The action against them, if any existed, was purely in tort, and could not be joined in the suit by stockholders to settle the assets of the insolvent bank, or by creditors to enforce their contracts.

It is argued, however, that the cross-plaintiffs, Emory's Sons, had, after a full knowledge of the transaction, elected to proceed against Dorn or his estate for the payment of their debt, and are now precluded from looking to the bank (the unknown principal) at the time the loan of the money was made to Dorn and the stock of the bank pledged.

The cross-action of Emory's Sons was pending against the bank when they presented Dorn's notes to his administrator in the settlement of Dorn's estate. Dorn had died, and the action being pending for a distribution of the assets of his estate between his creditors, the notes were presented and proven as claims, and the *pro rata* of a few cents on the dollar paid to and received by Emory's Sons.

The bank had filed the notes executed by Dorn for the stock pledged to Emory's Sons as claims against Dorn's estate, and the commissioner reporting that the stock was not in fact purchased by Dorn, but to raise money for the bank, the latter or its assignee withdrew the notes without prejudice to any claim that might thereafter be asserted. That Dorn was liable to Emory's Sons is evident, and that the bank was also liable after the discovery that it was the real principal, is also plain. It was not, however, a joint liability, and Emory's Sons, after being in possession of all the facts, could abandon the right to claim against the bank and look alone to Dorn. The contract was either with the principal, so far as Emory's Sons were concerned, or with the agent, and both could not be made liable in a joint action. Dorn's estate was insolvent, and known to be such by the creditors, when the claim of Emory's Sons was presented. The bank was also known to be insolvent, and the assets of both combined insufficient to pay Emory's debt.

The actions to settle the affairs of the bank and Dorn's estate were in chancery, and pending in the same court, with the cross-action of Emory's Sons pending in the bank case to make the bank liable. It

is now insisted that the filing of the notes in the Dorn
suit and collecting the *pro rata* was a conclusive
election on the part of Emory's Sons to look to Dorn's
estate for the money and not to the bank. If such
facts constitute in law an election, then the judg-
ment below dismissing the claim of Emory's Sons was
proper; but if the question is one of fact, by which the
intent of the creditor to make the election is to be
determined, then there was no such election as pre-
cluded Emory's Sons from looking to the bank for
payment. That the plaintiffs in the cross-petition had
elected to sue the bank, and were prosecuting the claim,
when it was filed in the case against Dorn's estate,
against the bank, and continued to prosecute it, is con-
ceded. The assets from Dorn's estate scarcely paid the
cost of presenting the claim in order to obtain the *pro
rata*, and under such circumstances it would be un-
reasonable to hold that it was an election to abandon
the action against the principal, and look alone to the
agent. Story, in his work on Agency, says that while
the creditor has his election to sue, either in a dis-
tinct and separate action, the creditor is not precluded
by such an election from maintaining another action
against the party not sued, unless he has in the first
action obtained a complete satisfaction of his claim.
(Story on Agency, section 295.)

While this doctrine in its broad statement is not
sustained by the weight of authority, the general rule,
as laid down by Wharton, is sustained by nearly all
the authorities, and that is: "In order to relieve the
principal, there must be something equivalent to an
election not to charge the principal, and whether there

is such an election is a question of fact, which is not determined by charging the agent after knowledge of the principal." (Wharton on Agency, section 472.)

The English rule is, that "after the agent has been sued to judgment, the right to resort to the principal is lost." (Priestley v. Fernie, 3 H. & C., 977.)

We think the undoubted rule is, that if when the creditor discovers the principal, and with a full knowledge of the circumstances connected with the transaction, he then gives the sole credit to the agent, or proceeds to judgment against him, it is equivalent to an election to abandon all claim against the principal.

That such facts may exist as would preclude the creditor as a matter of law from proceeding against the principal is not doubted, as in the case given, when the creditor, with a full knowledge of all the facts, should elect to sue the agent to judgment; nothing else appearing, the law would say that it was an election to look to the one sued, and an abandonment of all claim against the other.

In the case of Curtis v. Williamson, 10 Law Reports, Court of Queen's Bench, 57, where the goods were purchased in the name of Bowlton, without disclosing his agency, the fact of the agency having been subsequently discovered, the creditor, Bowlton, having filed a petition for the liquidation of his estate, inclosed his claim to be filed for payment properly proven. His attorneys, fearing that it might prejudice the claim against the principal, telegraphed to the commissioner not to file the affidavit; but the dispatch not being received in time, the claim was filed, but no money paid on it. After this was done, proceedings

were commenced against the principal, and the defense was that the creditor had elected to proceed against the agent. The court held that it was no bar. "That the creditor had the right within a reasonable time to elect to proceed against the principal, and unless, in the meantime, with full knowledge as to who were the principals, and with the full power of choosing between them and the agent, they had distinctly, and unquestionably elected to treat the agent alone as their debtor," his right to proceed against the principal had not been lost. The court further said: "In general, the question of election can only be properly dealt with as a question of fact for the jury, subject to the direction of the presiding judge."

In Priestly v. Fernie, above, where the party had sued the agent and obtained judgment, nothing else appearing, it was held that no action could be maintained against the principal.

In Calder v. Dobell, 6 Common Pleas British Law Reports, 486, the creditor had taken the note of the agent, where the name of the principal had been disclosed, and it was held that the parol circumstances under which the contract was made were admissible, and the taking of the note from the agent did not necessarily amount to an election on the part of the plaintiffs to give credit to the agent only. In Paige v. Stone, 10 Met., Mass., 160, it was held that the taking of the note of the agent alone, under a knowledge of the circumstances, was a discharge of the principal. In Calder v. Dobell, parol evidence was admitted to explain the circumstances under which the note was taken, and the only question raised in that case was as to the admis-

sibility of that character of testimony when attempting to charge the principal. No such question was raised or made in the case of Paige v. Stone, that case having been decided on the want of authority by the agent to execute negotiable paper for the principal. The doctrine laid down in that case is, however, the correct rule. If the creditor with a knowledge of the facts and the liability of the principal, saw proper to take the note of the agent, the principal is released. The creditor may give the exclusive credit to the one or the other, and in doing so, with a knowledge of all the facts, he must look to the one to whom he has given the credit. In Raymond v. Crown and Eagle Mills, 2 Met., Mass., 319, the creditor proceeded in the lower court against both the principal and the agent, and when it reached the Supreme Court the writ or proceeding was dismissed as to the agent. The principal there argued that as the creditor had continued to charge the agent after he knew the liability of the principal, it was an election to look to the agent; but the court held that the creditor might have erroneously supposed that he could charge both at the same time in the same action, and it was clearly open to any reasonable explanation consistent with the purpose of relying on the liability of the principal at all times after their liability was discovered; that it was one of those cases where the party, intending to retain all his legal rights, was yet uncertain upon whom the legal responsibility might be fixed, etc.

In the case before us an election had been made, and an action progressing, in which the creditors were seeking to make the principal liable, and the mere fact

of the claim and allowance to them in the distribution of the assets of the insolvent cashier was not an abandonment of the action against the bank. It would be unreasonable to hold, as a matter of law, under such a state of facts as exists in this case, that the right to pursue the principal was lost, and that Emory's Sons intended to look alone to Dorn's estate for their money.

The judgment below is, therefore, affirmed, except as to the complaint of Emory's Sons on their cross-petition. They are the creditors of the bank, and its assets and stock must pay their debt. Some of the stock was sold or transferred prior to the bringing of this cross-action. Other stockholders have their discharge in bankruptcy, and the names or number of stockholders required to contribute, if the assets on hand are not sufficient, is not ascertained by this opinion. The amount received by Emory's Sons from the sale of the stock and from Dorn's estate must be credited on their claim. The case is remanded on the cross-petition of Emory's Sons for proceedings consistent with this opinion. (Thompson v. Davenport, 9 B. & C., 78; United Society of Shakers v. Underwood, 9 Bush, 609; Dunn's Administrator v. Kyle's Executor, &c., 14 Bush, 134.)