ROBINSON, Respondent, vs. PARKER, Commissioner of Banking, Appellant.

*December 11, 1926—April 5, 1927.*

*Banks: Loan made by depositor to officer to avert closing: Evidence: Sufficiency: Bank not undisclosed principal.*

The Bank of E. was insolvent, and the commissioner of banking informed P., who was its president and the owner of a large majority of its capital stock, that unless certain worthless assets were withdrawn and new ones of sound value substituted the bank would be closed. P. borrowed of the plaintiff $50,000 which was on deposit in the bank, giving his personal notes, and at the suggestion of the banking department the money was deposited in a special trust account, and substantially all of it was used to replace worthless assets which were written off and which were assigned to P. *Held*, that although P. had misrepresented to plaintiff the use for which the loan was intended, the finding of the jury that it was a bank loan, and that P. when he procured it acted for and on behalf of the bank as an undisclosed principal, is not sustained by any credible evidence.

APPEAL from a judgment in plaintiff's favor of the circuit court for Rock county: GEORGE GRIMM, Circuit Judge. *Reversed.*

The Bank of Evansville was organized with a capital stock of $25,000, of which George L. Pullen, the president, held 170 shares, while the remaining shares were held by members of his immediate family or other near relatives.

In the latter part of November, 1923, and during the month of December and the early part of January, 1924, the banking department of this state, while making an official examination of the affairs of the bank, discovered that it was insolvent, due to its holding of between $70,000 and $75,000 worth of assets which were worthless. A number of conferences were held at the office of the banking department in the Capitol in December and the early part of January, which were attended by Pullen, and on these occasions the latter was informed by the commissioner that the bank would not be permitted to continue business unless the worthless assets were withdrawn and new ones of the par value of those withdrawn substituted. At one of these conferences plaintiff's name was mentioned by Pullen, in connection with a number of others, as one who might be induced to furnish aid to relieve or remedy the situation.

During the latter part of December, 1923, or the early part of January, 1924, Pullen conferred with the plaintiff, but what actually transpired at such conference is in sharp conflict in the evidence. According to plaintiff's version, Pullen informed him that the banking department had made an examination of the bank and had discovered plaintiff's deposit in the sum of $50,000, which it criticised as being entirely too large for any one depositor. On the other hand, Pullen testified that he informed the plaintiff that the banking department had criticised some of the bank's loans, and that the securities evidencing such loans were doubtful in their character, and that something had to be done to remedy the situation, and that in such conference the loan of the plaintiff of $50,000 was suggested. Of the $50,000 referred to in the Bank of Evansville, $38,000 belonged to the plaintiff and the balance belonged to plaintiff's son, Hugh. It was finally arranged that the total sum should be paid over to Pullen, for which Pullen agreed to and did execute two promissory notes, one dated January 3, 1924,

for the sum of $38,000, payable to the order of the plaintiff on demand, with interest at the rate of six per cent. per annum, payable annually, and another note of like date, for the sum of $12,000, payable on demand to H. H. Robinson (the latter being plaintiff's son), with interest at the rate of six per cent. per annum, payable annually.

On or about January 14, 1924, at the suggestion of the banking department, the $50,000 so obtained by Pullen was deposited in a special trust account in the bank, and an entry evidencing such transaction was made upon the books of the bank. On the same date one of the bank examiners wrote to the plaintiff as follows:

"It is understood that you have together with H. H. Robinson loaned to Geo. L. Pullen $50,000. It is understood that this is a personal loan and that the Bank of Evansville has no liability thereon.

"Will you kindly advise us whether or not you consider the bank in any way liable on same. We would also appreciate it if Mr. H. H. Robinson would sign any statement you make in this matter.

"Awaiting your reply, I am,

"Very truly yours,    M. O. Tuhus."

A little over one month after the receipt of this letter by the plaintiff he made the following reply: "Your understanding that this is a personal loan to Geo. L. Pullen is correct. J. C. Robinson & Son."

On May 13, 1924, the teller's day record shows a debit on the book of Pullen, trustee, of $49,314.45, and on the other side notes charged off, aggregating $43,725, and a judgment of $5,589.45, making a total of $49,314.45, thus leaving in the trustee's account the sum of $685.55, which remained therein until January 30, 1925, when it was withdrawn by Pullen personally.

The bank continued to do business until June 23, 1925, when it was closed by order of the banking commissioner, who took charge of the institution for liquidation purposes.

Pullen was declared a bankrupt, and plaintiff filed his claim in his bankrupt estate. In November, 1925, upon an examination of the bankrupt, *Mr. Robinson* for the first time obtained knowledge of the use made of the money loaned by him to Pullen, and he thereupon withdrew his claim in the matter of the bankrupt estate of Pullen and filed the same against the bank.

The case was submitted to the jury upon a special verdict, and the jury answered as follows: (1) In borrowing from *Robinson* the money involved in this action, George L. Pullen acted in behalf of the Bank of Evansville. (2) Before George L. Pullen borrowed the money from *Robinson* he did not disclose to him that he was acting in behalf of the Bank of Evansville in borrowing this money. (3) The Bank of Evansville received the money borrowed from *Robinson* for its own use and benefit.

On this verdict judgment was entered in plaintiff's favor, and from such judgment the defendant has prosecuted this appeal. Further facts will be referred to in the opinion.

For the appellant there were briefs by *Roger G. & Robert J. Cunningham* of Janesville, attorneys, and the *Attorney General* and *C. A. Erikson,* deputy attorney general, of counsel, and oral argument by *Mr. Robert J. Cunningham, Mr. Roger G. Cunningham,* and *Mr. Erikson.*

For the respondent there was a brief by *Jeffris, Mouat, Oestreich, Avery & Wood* of Janesville, and oral argument by *O. A. Oestreich.*

The following opinion was filed January 11, 1927:

DOERFLER, J. The vital issue herein resolves itself as follows: Was the loan of $50,000 a personal loan, to enable Pullen to enhance the assets of the bank by substituting cash for worthless securities, or was Pullen, when he procured the money from the plaintiff, acting for and in behalf of the bank, an undisclosed principal? Briefly stated, was the loan

a personal loan, or was it a bank loan? The jury found in substance that the loan was a bank loan, and that Pullen acted when he procured the loan for and in behalf of the bank, an undisclosed principal, and if this finding is supported by credible evidence then the judgment must be affirmed.

When the capital of a bank is either materially impaired or entirely wiped out by reason of worthless loans, a precarious situation is presented. It is practically. conceded by the parties herein that when the condition of the bank was revealed, upon an examination made by the banking department, the bank held between $70,000 and $75,000 of worthless securities, an amount almost three times as large as the entire capitalization of the bank. Banks are not infallible in their loans, for, if they were, insolvency would seldom occur. For a bank capitalized at a million or more dollars, $70,000 worth of doubtful or worthless loans might represent a condition not uncommon; but if a bank capitalized at one million dollars held three million dollars of worthless loans in its assets, it must be conceded that the situation presented would be appalling.

This small country banking institution, which served the people of Evansville and the farming community in its immediate vicinity, in the course of the conduct of its business reached a point in its career where it could not safely be permitted to continue unless its capital were repaired within a reasonable time. The record does not disclose the length of time during which the bank was in fact insolvent prior to the examination made in the fall of 1923, but it is reasonable to assume that the defective assets represented an accumulation covering considerable time, during which period the insolvent condition was unknown to the banking department. It is practically impossible for the banking department to cause a minute investigation to be made of the value of the assets each time that a bank is examined, and therefore in many instances the paper condition of the bank is passed ·

upon favorably, when if the true facts were known the bank would be condemned. If any one in connection with this institution was aware of the condition of the bank, not only at the time of the examination but for some time prior thereto, it was Pullen. He was its president, the president of the board of directors, held a majority of the stock, and was the very life and spirit of the institution. Under the law it was· his duty to disclose to the banking department from time to time its true condition, which he failed to do. This is especially brought to the fore in this opinion because it has a tendency to affect Pullen's credibility, and the answer of the jury to the first question of the special verdict is based solely upon the uncorroborated testimony of Pullen.

Pullen not only misrepresented to the plaintiff the nature of the criticism of the banking department, but he committed an actual fraud upon him by stating that the banking department found fault with the size of plaintiff's deposit. This was a rather shrewd and plausible representation, ·for it requires no argument to show that one having a deposit of $50,000 in a bank with a $25,000 capital could readily embarrass the bank at almost any time when the cash assets are insufficient to meet an immediate demand. This proves that Pullen was not only shrewd and designing but also resourceful; that he evolved this scheme as a means by which he could deceive his most intimate, lifetime friend. Had he disclosed the true situation, as he claims, the plaintiff undoubtedly would have balked in assuming the enormous risk of placing the savings of a lifetime into an institution which appeared to be a hopeless wreck. The jury did not believe Pullen's statement, and it was fully justified in its conclusion.

The banking department in this state was created by the legislature to serve a distinct and recognized public interest. Prior to the numerous bank failures which largely precipi-· tated the panic of 1893, public supervision of banks as now

in vogue was practically unknown in this state.  Since the establishment of the banking supervision by the commissioner of banking many failures have been averted.  Under the provisions of the statutes, the supervision of all state banks comes under the jurisdiction of the banking commissioner.  A bank may be perfectly solvent and yet may not have sufficient cash assets on hand to meet the daily requirements of depositors.  Such a situation is not uncommon, and when it comes to the knowledge of the commissioner he co-operates with the bank, with his advice and suggestions, in order that the condition may be rectified.  Securities otherwise perfectly sound may be of such a nature as to make it impossible to realize upon them promptly.  In other words, they may constitute frozen assets; and here again the banking department serves a useful public purpose when it advises a change.  The method of bookkeeping employed may either be antiquated or in such a form that it does not reflect the true condition of the bank; and here again the banking department, by requiring a uniform and approved system, affords a high degree of public service.  But by far the most dangerous and serious condition in a bank is not where the capital is either substantially impaired or entirely wiped out.  Such a condition manifests imminent danger to depositors, and requires prompt and efficient action on the part of the banking department.  But even under such a situation the commissioner, in the exercise of a wise judgment, in many instances, by his advice and suggestions, has averted many a disastrous failure.

We are naturally, therefore, led to the inquiry of how a bank failure, under such circumstances, can be averted.  In prescribing a remedy a physician attempts to reach and remove the cause of the ailment.  It would be useless and idle for one suffering from bronchial trouble to resort to a prescription designed to relieve or cure an affection of the kidneys; and what is true in medicine is likewise true of a bank ailment.  A bank which suffers merely from a want of ready

cash to meet the demands of its patrons needs the cash, and this can be supplied either by a liquidation of its loans or by the borrowing of money; but the money realized in either event would not convert an insolvent bank, with an impaired capital, into a solvent one. And it is considered that this lies at the very threshold of the solution of the vital question involved in this case. Therefore it is the common practice, generally known, that under such circumstances the bank commissioner recommends an assessment upon the capital stock in order that the depleted capital may be restored, and if such assessment is not made or realized the bank is closed and liquidated. But while an assessment of stock is frequently resorted to, it is not uncommon that the persons vitally interested in the bank and who hold the controlling stock, and particularly where the institution, like the instant one, is a family affair, furnish the needed capital, and in so far as the public interest is concerned, which is represented by the banking department, it is immaterial which remedy is resorted to.

No assessment of stock was attempted in the instant case; and, in fact, the evidence does not disclose that it was seriously considered. Therefore, the only other remedy available in the premises consisted of the voluntary contribution of Pullen or some other person, of good capital assets, as a substitute for the condemned ones. The bank was not closed, but Pullen was notified that unless the condition were rectified such action would necessarily have to follow. A mere loan to the bank of $50,000, or even of $100,000, would not have converted this bank from a condition of insolvency to one of solvency, for while such a loan would increase the assets it would at the same time correspondingly increase the liabilities.

Pullen deposited the money obtained from *Robinson,* at the suggestion of the bank examiner, in a trust account. The purpose of such deposit in such form becomes apparent. It acted as an insurmountable obstacle to his use of the sum

for any purpose other than that for which it was intended, and it gave assurance to the department that the depositors would be protected. When the worthless assets were listed it was Pullen who, in May, 1924, indorsed a large number of them to himself and made the substitution. Recognizing that the balance of $685.55 still on deposit in the trust account was furnished by Pullen, the banking department consented to the withdrawal of this amount, and Pullen individually withdrew the same. When the trust account was ordered to be opened on the books of the bank, the commissioner, undoubtedly forestalling a situation such as is here now presented, took the precaution of writing to the plaintiff, informing him that the department understood that the loan made by the plaintiff was a personal loan and that the bank was in nowise liable thereon. In his reply to this letter, which was mailed about five weeks after the department's letter was written, plaintiff confirmed the examiner's view. It appears without contradiction in the evidence that both the plaintiff and the banking department considered this loan a personal one. The banking department was interested in this matter solely from an official standpoint, and it became active for no other purpose than that of protecting the public.

In sharp contrast to the view of the department and that of the plaintiff is the testimony of Pullen that in securing the loan he acted for and in behalf of the bank. We consider his testimony incredible, not only in view of all the testimony in the case but of the physical situation and the surrounding facts and circumstances. We therefore conclude that there was no credible evidence upon which the jury's answer to the first question of the special verdict can be sustained.

Great reliance is placed by respondent's counsel on the case of *Jones v. Johnson,* reported in 86 Ky. 530, 6 S. W. 582. This case is one of the leading cases involving the rights of a lender of money against an undisclosed principal,

and the logic in that case is so convincing as to make it nigh unanswerable. But the Kentucky case in its facts is not one which can be considered a precedent herein, nor are the situations involved in the two cases parallel. A careful reading of the *Jones Case* will convince the reader that the loan made by the cross-petitioner, Emery's Sons, was made through an officer of the bank, pursuant to resolutions duly passed by the board of directors, in the interests of the bank. It was therefore clearly a bank loan.

It can hardly be said, nor can it logically be inferred, that the banking department intended to commit a fraud upon the public; on the contrary, its action is in harmony with its public duty, and indicates an attempt to save a perilous situation which might seriously have affected a large portion of the community which was tributary to the bank's business. It must also be assumed that the banking department did not intend to create a temporary makeshift, but that its efforts were directed to a permanent improvement in the bank's condition with respect to the identical weakness of the institution which it was its desire to have remedied.

If the money substituted in place of the securities may be deemed a mere loan to the bank, then the plaintiff, under the theory advanced by respondent's counsel, could have proceeded to secure a repayment at any time when he discovered the use made of the money by Pullen. It must also be remembered that the trust account in the bank was closed and that the proceeds of the loan became assets of the bank, which made it possible for the continuance of the business of the bank. Any depositor doing business with the bank after the substitution of the money for the worthless assets had the right to rely upon the fact that the bank's insolvency had been averted, and if it became possible for the plaintiff at any time to withdraw his money, then it appears to us that a fraud was committed upon the patrons of the bank who saw fit to place trust in the bank.

Looking at the case from any angle that may be suggested, we are led to the inevitable conclusion that the position taken by the banking department is correct, and that the answer of the jury to the first question of the special verdict finds no credible evidence supporting it.

*By the Court.*—The judgment of the lower court is reversed, and the cause is remanded with directions to dismiss the complaint.

ESCHWEILER, J., dissents.

A motion for a rehearing was denied, with $25 costs, on April 5, 1927.