JUDGE PRYOR
delivered the opinion oe the court.
"We have devoted much time to the consideration of the questions arising upon the demurrer of the appellees to the several petitions filed by the appellants, and while many of the objections urged are well taken, and fatal to some of the grounds of complaint, still the answer filed may be regarded as raising such an issue as authorized the court below to pass upon the facts. This the court must have done, as the demurrer to the petition as amended was overruled and an affirmance now, by reason of the defective pleading, would amount to a disposal of the case without passing upon the •merits, and deprive the appellants of the opportunity to amend. This court therefore will not dispose of the questions made upon the petition and answer, but proceed to consider the liability of the appellees upon the facts presented in the record.
The appellees, the president and directors of the Harrods-burg Savings Institution, are sought to be made personally liable for large sums of money belonging to that institution, alleged to have been wrongfully and fraudulently misappropriated by the appellees and the agents and officers selected by them to aid in conducting its business. It is also alleged that the appellees failed to supervise and manage the funds of the institution with ordinary prudence and judgment, and by the .gross negligence of themselves and their agents caused great loss to the plaintiffs, by rendering their stock in the bank worthless; that they failed to take a bond or bonds from the officers and agents, and omitted other duties, on account of *136 which they say the appellees are liable. The shareholders or their representatives are the plaintiffs in the action.
The company was organized in the year 1854, with a capital stock of $50,000, and continued to dg business until the year 1867. J. ~W. Cardwell was the acting cashier from the year 1855 until the bank ceased to do business in 1867, at which time, by an act of the legislature, the. company was authorized to sell, and did sell and transfer all of its assets as well as its corporate privileges to E. Hutchison & Co. ' The fraudulent misappropriation of the funds of the bank by its cashier constitutes the principal cause of complaint, by the shareholders, against the directors. The appellees (directors) were also shareholders in the corporation.
The proof conduces to show that the shareholders sustained a heavy pecuniary loss by reason of the many false, erroneous, and fraudulent entries made on the books of the bank while Cardwell acted as cashier, as well as a loss by the wrongful misappropriation of the funds. The stock was rendered valueless. The frauds practiced by him occurred during the last four or five years of the period in which he discharged the duties as cashier, and were practiced with such adroitness as to enable him to escape detection, or even suspicion on the part of the directors, or any of them, for the entire period. A skillful accountant, with a suspicion resting on his mind as to the honesty of this man, would háve detected his frauds at once, and prevented these heavy losses to the parties in interest; but those who had such implicit confidence in him, as to place almost the sole control of the bank in his hands, he found but little difficulty in deceiving, and eluded by his shrewdness any suspicion even, although the preponderance of the proof shows that the appellees, in the discharge of their duties toward him and the bank, exercised at least ordinary diligence.
The appellants do not attempt to establish by the proof *137 that the board of directors had fraudulently or wrongfully misapplied the funds of the bank to their own use, or that they connived at the wrongful acts of the cashier, and the sole question, in the case, is the degree of care required of these officers in supervising and controlling the affairs of that institution.
In cases involving the direct action of the directors, Morse on Banking says: “But for excusable mistakes concerning the law, and for many errors strictly of discretion, they are not liable. Though in cases in which their action has been so grossly ill-advised as to warrant the imputation of fraud, or to show a want of the knowledge absolutely necessary for the performance of their duties, so great that they were not justified in assuming the office, they may be held responsible.” (Page 117.)
In Spring v. Smith, 21 Penn., Sharswood, judge, in discussing the liability of directors to stockholders says: “ Ought they to be held responsible for mistakes of judgment or want of skill and knowledge; They have been requested by their co-stockholders to take their positions, and they have given -~ their services without compensation. We are dealing now with their responsibility to stockholders, not to outside parties. Upon a close examination of all the reported cases, although there are many dicta not easily reconcilable, yet I have found no judgment or decree which has held directors to account, except when they have themselves been guilty of some fraud on the corporation, or have known and connived at some fraud in others, or when some fraud might have been prevented had they given ordinary attention in the discharge of their duties,” etc.
Cardwell, at the time he was appointed cashier, possessed a high character for integrity, having the confidence of the entire community in which he lived. He was selected by the directors on account of this character and his known quali *138 fications for the place he was called to occupy. The proof tends to show that the appellees knew but little if any thing of bank transactions. The stockholders now complaining lived in the same vicinity with the directors, and were fully aware of their business capacity in this regard. The directors were also stockholders, and all the parties in interest seem to have fixed upon Cardwell by reason of his peculiar fitness for the place, as well as the necessity for employing such a man, in the absence of any knowledge or experience by the members of the board, or any of them, in conducting such an institution. The capacity of the directors was known to the stockholders. They did not seek the appointment or profess to possess the financial ability requisite to run the bank. They were selected because they were stockholders, and lived perhaps convenient to the institution, and under such circumstances undertook to discharge with ordinary diligence the duties imposed upon them, to be measured by their capacity and their knowledge of bank transactions.
Cardwell, being the business man in whom all confided, managed this bank from the year 1855 till the year 1867, with a skillful and competent book-keeper, or assistant, to aid him much of the time, whose character for honesty is not questioned in the record. Neither this book-keeper, the president, directors, or stockholders ever discovered any of Card-well’s frauds, or even suspected any of his motives or actions with reference to any transaction connected with the bank. Large deposits of money were made, and seemingly a prosperous business carried on. The demands of depositors were always met.
A dividend of five per cent was semi-annually declared up to the very moment the institution was sold out, and not only declared, but paid over to the shareholders. The capital stock was $50,000, and the dividends actually paid to stockholders amounted to $68,000. It was not until after E. Hutchison & *139 Co. made their purchase that the fraud of Cardwell was ascertained. When the assets of the bank were turned over to E. Hutchison & Co. they still retained him as the cashier of the institution, discharging him as soon as his fraudulent acts were discovered. Many of the frauds consisted in raising checks and making false entries. From the language of the .witness, the bank lost large sums of money by his failing to post to his individual account from cash - blotter, and by fraudulently posting and raising the amounts from cash-blotter to his account on individual ledger, etc.
We have made some slight examination of the books, and find the book evidencing the daily transactions of the bank corresponds with the statements found in the general ledger. Forged entries were made in some of the bank-books to make them and the monthly and weekly statements correspond with the notes, bills, and moneys on hand. It appears, from undoubted proof, that statements of the condition of the bank were made monthly and examined by the directors, except during short intervals, when the war was pending, and further, that the notes, bills, and money were counted by them two or three times a year. The accounts of the bank were, in fact, correct, except slight discrepancies, until within the last four or five years of the cashier’s employment, and the prompt payment of the semi-annual dividend indicated to the directors and stockholders that the affairs of the institution were in a prosperous condition.
This court, in the case of the Shakers v. Underwood, 9 Bush, 617, in discussing the liability of bank directors to special depositors, say, that the directors, by reason of their position, “ invite the public to deal with the corporation, and when any one accepts their invitation he has the right to expect reasonable diligence and good faith at their hands.” Again, “ An honest administration of the affairs of the bank, and slight diligence, at least, in preventing special deposits from being *140 converted to its own use, were legal duties which the directors were under obligations to the special depositor to perform.” The petition in that case alleged that the bonds of the special depositor were not only sold by the officers of the bank, and the proceeds applied to the purposes of the bank, but in addition thereto that the directors had notice of the acts of these agents. The court further said, “ Treating the bank as a bailee only, and the directors as its agents, it is clear that if they directed the sale of the deposits, or knowingly permitted them to be sold, they thereby became participants in the wrong.” There was proof conducing to sustain the issues made in that case, and the action pending was by a party against the directors who had no voice in their selection, but who had the right to trust in their ability as well as fidelity to control the affairs of the bank. Not so with a stockholder.
The experience of life with reference to the selection of directors in banks, and particularly the character of directors now under consideration is, that directors are selected from the stockholders more on account of their proximity to the banking-house, or the amount of capital invested, than their fitness for the office, and this conclusion is certainly warranted from the facts in this case.
The stockholders knew their qualifications for the place, and therefore when the directors undertook to act, they agreed to discharge their duties faithfully to the extent of their ability. “ If he is known (the mandatory) to possess no particular skill or knowledge, and yet undertakes to do the best he can under all ,the circumstances, all that is required of him is a fair exercise of judgment, knowledge, and capacity.” “ Prima facie in case of general mandate, the fact that the party did the work — on like goods of his own — would repel the imputation of negligence.” (Story on Bailments, secs. 182, 183.)
Bad faith or gross negligence is certainly necessary - to *141 render the director liable to a stockholder in a ease like this. The directors were interested in the bank as shareholders. Their own interests prompted them to use at least ordinary diligence, and when trusting to the honesty and fidelity of their cashier, and at the same time exercising that character of vigilance that is usual and customary with bank-directors, it can not be said that there was nevertheless an absence of ordinary care and such bad faith on their part as made them liable to the appellants. If they had selected a cashier who was known to be of bad character or incompetent to discharge the duties assigned him, it would be such a disregard of the interests of the stockholder as to imply bad faith; but when they select a man who at the time is universally regarded as honest and capable, and for the reason that they are themselves ignorant of the business in which they are about to embark, they have done only what the stockholders themselves would have done under the circumstances, and acted as ordinarily prudent men would have acted with reference to their own business transactions. They had the right repose confidence in the cashier, and particularly when through a period of seven years he had conducted the affairs of the bank with great success and without giving any cause on the part of. the most vigilant to suspect him of committing any act upon which a suspicion of wrong might have been based.
The directors, even as to strangers and certainly as to stockholders, do not insure the fidelity and honesty of those employed in the bank and filling subordinate positions. The testimony in this case has failed to make out a case showing fraud on the part of the directors, or a willful disregard of duty, but, on the contrary, evidences a misplaced confidence' on the part of all interested in this cashier, and that the directors were deceived when in good faith attempting to discharge their duties. (Scott v. Depeyster, 1 Edwards’s Chy. Rep. 526.)
The commissioner, in his report, on page 648, shows that *142 there was actually paid out during the operations of this bank, as money actually made, from a capital of $50,000, including dividends, interest, and banking-house account, near $140,000. This evidenced the healthy condition of the bank, and connected with the high standing and supposed qualifications of the cashier, was calculated to mislead the most vigilant. We have examined the statement of a bank accountant who has attempted to explain the manner in which a director may ascertain whether or not the daily transactions of the bank are correct and tally with the books, and we are satisfied no one but a skilled accountant can, without much mental effort, understand the explanation; and to enter upon the investigation so as to ascertain the result without being an experienced book-keeper would be fruitless. It required an expert in fact to ascertain the condition of the bank and point out the frauds practiced by the cashier. Neither the president last in •charge of the institution, or Kyle, or any of the directors, seem to have known of the errors, and no doubt were unable to detect; them. When the fact was disclosed, that a stupendous fraud of some sort had been perpetrated, under such circumstances, it seems to us, that neither the president, with a salary of two or three hundred dollars per annum, nor the directors, should be held responsible for the default of the cashier.
This court in the case of Ray’s administrator v. the Bank of Kentucky, said that “ a gratuitous bailee was not responsible for loss unless occasioned by fraud or gross negligence on his part, and the presumption of fraud is rebutted by the fact that he observed the same care and diligence in preserving the deposits that he did in the preservation of his own property of like character and value.”
Nor should the president, with a nominal salary, be held to a stricter account than the use of ordinary care, as the small amount was no doubt paid him in this case, more for the reason that, he was oftener at the bank than the other mem *143 bers of tbe board, than as compensation for services as president.
If we test the diligence of the appellees by that exercised by E. Hutchison, who represents a large interest personally and otherwise in this litigation, it will be found that he insists that the action of the appellees with reference to this bank is to be measured by a different standard from his own. He failed, or rather the board, while he was president of the institution at its inception, to take' a bond from the cashier Cardwell, He selected Cardwell, in conjunction with his co-purchasers, to run the bank as cashier after his purchase, and having employed him as such never required any bond. Many of these stockholders, plaintiffs, overdrew their accounts with the bank, and now urge that those who had embarked with them in this joint enterprise with a like interest have been grossly negligent, while they as stockholders are perfectly blameless. This view of the question is not sustained by the proof. It is true that Cardwell overdrew his account, or by false entries managed to obtain the money, whether the one way or the other is uncertain. The monthly statements, so far as the proof shows, made by Cardwell, to the board, of the condition of the bank, do not indicate even to the directors that this large overdraft had been made. Carclwell, it seems, deposited large sums of money for himself and as the agent and representative of others. His pecuniary condition was not questioned, and there was no reason why the directors, without some cause for it at least, should enter upon an investigation of his account. Fisher says that the $22,000 draft of August, 1865, was not in fact' overdrawn by Cardwell, and proceeds to explain that it was the result or consummation of frauds already practiced.
As to the infraction of the by-laws by the directors in loaning money to one of their body, it may be said that there is nothing in the charter requiring the enactment of such a *144 rule; or any provision by which such a loan is forbidden. The by-laws being made by the directors may be repealed or modified; and besides, there is no averment in the petition giving the name of the director, or any allegation of his insolvency, or that he has failed to account for the money thus loaned to the bank.
The proof in regard to the execution of the bond by the cashier is conflicting, but certainly enough is in the record to sustain a verdict or judgment determining such an issue in the affirmative. The court below and the commissioner both determined from the proof that a bond had been executed. It also appears that an action is pending on this bond (alleged to have been lost) against the cashier and his sureties in the name of the corporation? The appellees, at the time it was proposed to submit this case for hearing, desired its postponement until that question was determined. This was refused by the court, whether at the instance of appellants does not appear, but it certainly follows that a recovery on the bond would, if the negligence of the appellees was established, lessen their liability to that extent, and might be sufficient to cover their entire responsibility.
We are not altogether satisfied as to the extent of the frauds practiced by the cashier. His accounts' were carefully kept, and it may be that he frequently made erroneous charges against himself in order to make his monthly statements tally with the books. The presumptions, however, are all against him, and we see nothing in the record to palliate his acts. But as to the appellees, there is no evidence of fraud or bad faith, or such gross negligence as would imply bad faith, and in the absence of such proof, the appellants and appellees having embarked in the same enterprise, and being the victims of a misplaced confidence, they ought, in justice and right, to abide the result of this common adventure.
As to the allowance made the commissioner, we are not *145 prepared to adjudge it to be improper. It required much time and skill to examine as many as fourteen books of accounts with a view of settling the affairs of the bank and discovering the errors made by the defaulting ■ cashier. The allowance made is sustained by the oath of the commissioner as to the number of days he was engaged in adjusting the accounts, and also by the proof of others conversant with the labor performed. A question as to the payment of costs arises by reason of the character of the pleading in the case, and the necessity of a reference to the commissioner for a settlement of the entire accounts of the corporation. The action was instituted at law but tried by the court, the parties treating it as an action in equity.
The assets of the corporation had been sold to Hutchison & Co., and a settlement of its accounts was indispensable as between the stockholders desiring it, and the directors of the bank who were also stockholders. The case had, in fact, been converted into an action in equity. The court below was asked to make this settlement through the commissioner, and all the parties in interest should contribute to the payment of costs. The judgment below is affirmed except as to the costs. As to the costs, the judgment is reversed, with directions to require each one of the stockholders, parties, plaintiffs, or defendants in the action, -to contribute to the payment of the costs in the court below in proportion to the .amount of stock owned; and as to the costs in this court, the same is apportioned equally, one half to be paid by the appellants and one half by the appellees. On the appeal of appellants against Davis, the commissioner, the latter is awarded a judgment for his costs against them (appellants).