## Cunningham, et al. v. Shellman, et al.

(Decided May 11, 1915.)

### Appeal from Breckinridge Circuit Court.

1. Banks and Banking—Duty and Liability of Directors.—Directors of banks are under a duty to exercise ordinary care in the management and control of the affairs of the bank, and if they fail to exercise this degree of care and declare and pay dividends when the bank is insolvent, all the directors who receive the dividends so declared and paid are liable, under Sections 548 and 596, of the Kentucky Statutes, for all the debts of the bank.

2. Banks and Banking—Duty and Liability of Directors.—Directors of banks who make loans in excess of the statutory limit fixed by Section 583, of the Kentucky Statutes, are personally liable for any part of the excess that is lost to the bank.

C. M. FINN for appellants.

CLAUDE MERCER, H. DeH. MOORMAN and DEAN & DEAN for appellees.

Opinion of the Court by Judge Carroll—Reversing on original appeal and affirming on cross-appeal.

The Two States Bank opened for business in 1903 and continued until March, 1911, when, being insolvent, it made a deed of assignment for the benefit of its creditors. Soon thereafter this suit was brought by the appellants, who were depositors of the bank, as plaintiffs, suing for themselves and other depositors, against Shellman, Lee, Milner, Hamilton, Smith, Payne and Hardin, directors of the bank. The purpose of the suit was to recover from the directors dividends declared and paid by them when the bank was insolvent, and to further subject the directors to liability for the full amount due the plaintiffs and other depositors for whom they sued, upon the ground that the directors had not only violated the statute, but were grossly negligent in managing the affairs of the bank. They also sought to recover from the directors the several amounts lost by the bank on loans made in excess of the statutory limit. They further sought to recover the sum of five thousand dollars lost to the creditors of the bank by the gross negligence of the officers and directors in making false representations to a bonding company that was surety on the bond of the cashier, on account of which false representations the bonding company was relieved from liability on his bond.

After defensive pleadings had been filed and the case prepared for trial, it was submitted for hearing, and the court after finding that the assets of the bank would not pay more than 20% of its indebtedness to the depositors, who, it seems, were the only creditors, adjudged that the directors who were present when the dividends in January, 1907, and the subsequent semi-annual dividends were declared and ordered to be paid, were liable for the amounts so declared and paid, with interest from the date of institution of the suit. In other words, the court gave judgment only against the directors that it appeared from the records of the bank were present when each of these several dividends was declared and ordered to be paid, relieving from liability the directors who were not present when the dividends were declared and directed to be paid. A judgment was also given against Shellman, the president of the bank, for five thousand dollars on account of the fact that the

bonding company was relieved by his carelessness and negligence from liability on the bond of the cashier.

On this appeal by the depositors, it is insisted (1) that judgment should have gone against all the directors for the amount of each dividend declared and paid without reference to whether they were present and participated in the meeting at which the dividends were declared and ordered to be paid; (2) that the judgment should have allowed interest on the dividends for which judgment was awarded from the date when the dividend was declared in place of the date of the institution of the suit; (3) that the directors should have been liable for the full amount of the deposits; (4) that the directors should have been held liable for all loans made by the bank in excess of the statutory limit and which were a loss to the bank. In a cross-appeal Shellman asks relief from the judgment against him.

In view of the fact that this case presents questions of interest to bank officers and directors, as well as to depositors and creditors, we will set out with more than usual detail the facts and the law controlling the decision of the case.

The bank was established in 1903, with a capital stock of $15,000, and the amount of its capital remained unchanged. During the eight years of its existence, one John S. Adair was cashier, and J. A. Shellman the president, and the board of directors during the last five years consisted of Shellman, Smith, Payne, Milner, Hamilton, Lee and Hardin. The bank was situated in the small town of Stephensport, and although not doing a large business, it was regarded by the directors, depositors and stockholders as being in a solvent and prosperous condition until an examination by a bank examiner in March, 1911, revealed the true state of affairs by making and publishing the discovery that it was and had been for some five years insolvent.

When the bank was closed, it was discovered that the cashier, who was insolvent, had largely overdrawn his account; that he had borrowed large sums of money from the bank on his own note, and had invested its funds without security in enterprises promoted by him, or at least with which he was connected, and that had turned out to be failures.

For example, beginning in February, 1908, his account was overdrawn $2,689.51, and almost every month

from that time until March, 1911, his account showed that it was overdrawn in sums ranging from two thousand dollars down. At the close of business at the end of February, 1911, his account was overdrawn $2,875.56, and when the bank closed on March 10th, this overdraft was $3,362. All of these overdrafts appeared in their proper place and form on his account in the books of the bank; and at the end of each month the word "overdraft" was written in red ink, followed by the amount overdrawn.

There were also found among the assets of the bank worthless and unsecured notes of the Postal Stores Company, amounting to $4,900, and also several unsecured notes against a concern called the Happy Hollow Tobacco Co., amounting to $6,743, all of which were practically worthless. There were also uncollectable notes against M. A. Whitworth amounting to $3,611, and worthless notes of Adair to the amount of $2,150. The indebtedness represented by these and many other uncollectable notes was created at different times between 1906 and 1911, and all the notes were properly entered on the books of the bank in which a record of its notes was kept.

It was shown that of the loans and discounts, which consisted of some sixty thousand dollars, forty thousand dollars or over were worthless, and that the capital of the bank had been impaired for at least five years prior to 1911. The books further showed that there were no earnings or profits or surplus out of which dividends could have been declared for as much as five years before 1911.

As illustrating the manner in which the directors attended to their duties we insert the following evidence:

R. A. Shellman, who was a director in the bank from the time it commenced business until it closed, and president of the bank for at least a large part of that time, lived in the little town of Stephensport where the bank was located, and was a druggist by occupation. He was asked and answered the following questions:

"Q. Did the board of directors, or you, as president of the Two States Bank, ever at any of the meetings of the board of directors, inspect the bills and notes discounted, and other assets of the bank, and add them up to see how much the bills and notes amounted to and

how much cash the bank had on hand? A. I can't recall that we ever did all of that at any one meeting. Q. Did you or the board of directors ever take the bills and notes that were carried by the bank and inspect them to see what character of assets the bank was carrying? A. I don't think we ever took them all at any one time and looked through them. Q. You never added up the bills and notes and compared them with the books of the bank or with these statements that Mr. Adair would give you? A. I don't think we ever did. Q. You never counted the cash in bank and compared it with the statements that Mr. Adair would give you to see whether the correct amount of cash was on hand? A. I don't recall that we ever counted the cash at a meeting. We just supposed he had it correct. Q. What you did at these various meetings of the board of directors was to take the statement that Mr. Adair had drawn off and look at the general blotter and see whether or not his statement corresponded with the entry upon the teller's or general blotter? A. The amounts he showed us or the statement he gave us corresponded with the book that he showed he drawed the statements from. I am not familiar with the names of the books. Q. That is all the examination that you ever made of this bank? A. Yes, sir; along about that line. As I stated, we took his statements he presented to us, supposing them to be correct. Q. You never looked at any of these individual accounts, did you? A. No, sir. Q. You never tried to find out anything about whether John S. Adair's account was overdrawn or not? A. I never looked at it. I supposed he was honest in it. I had all confidence. Q. Did you ever see the note register? A. I never did examine it. Q. Did you know enough about banking to know that they kept a book in which they registered all notes, showing the date of the notes, when discounted, date of their maturity, the makers of the notes, the indorsers of the notes, and the amounts of the notes? A. I supposed all banks had a book showing all these things. Q. You knew that the Two States Bank had such a book? A. I never had looked through it. I suppose they had one. I suppose they kept a record of the notes. Q. Now when you declared dividends, did you make any examination to ascertain whether the dividends ought to be declared or not? A. We declared dividends on statements prepared by Mr. Adair. Q. Did you look at the bills and

notes to see whether or not all the overdue paper was charged off? A. I don't think we did. Q. You didn't make any further investigation into the assets of the bank than to accept Mr. Adair's statement that he made to you? A. I think that was about the substance. Supposed his statements to be correct. Q. And you never made any investigation to find out whether these statements were correct? A. No, sir."

G. W. Payne, a merchant at Stephensport, was a director in the bank from its organization until its failure, and attended all of the meetings of the directors except one. He was asked and answered these questions:

"State whether or not you ever knew of any loans of money made by the bank to Adair or the Happy Hollow Tobacco Company, or the Postal Stores Co., or to any one with Adair's name signed to the note as surety? A. No, sir. Q. Did you ever know of any overdraft of Adair's account. A. No, sir. Q. Is it not a fact that the directors and yourself had to depend largely on what Adair represented to you as the condition of the bank? A. Yes, sir; we depended wholly or mostly on that; at least, I did. Q. When did you first ascertain that the bank was in bad condition? A. I didn't know it until the bank was examined in March, 1911. Q. When the directors would declare dividends, state whether or not you knew that the bank had not earned those dividends or that the bank was insolvent? A. No, sir. Q. On whose statements did you declare these dividends? A. Mr. Adair's. Q. You knew as a member of the board of directors that the directors were not passing on the loans made by Adair for a number of years before the bank failed, didn't you? A. I think we knew that we were not passing on all of them. I know I didn't. I don't think I passed on any for three or four years. Q. The board of directors never required him to show them the bills and notes discounted or added them up or inspected them to see what character of assets the bank had? A. I don't know as they did. I never saw that done. Q. You never looked at the bills or loans? A. No, sir. Q. Just left the matter wholly with Mr. Adair? A. Only what they could get out of him by talking to him."

Roland A. Smith, a director during the existence of the bank, lived in Stephensport and was in the livery and steamboat business. Asked what he did towards

looking after the affairs of the bank as a director, he
said: "Well, I was a director there and we would have
our meetings and Mr. Adair would show the books. Of
course, I wasn't no bookkeeper and I couldn't tell
whether it was right or not. I would see the figures,
but I didn't know anything about them. Would just
have to take his word for it. Had all the confidence in
the world in the man. Q. Is it not a fact that the super-
vision and operation of the bank was confined entirely
to Mr. Adair by the directors? A. Yes, sir; it was. Q.
State whether or not there was anything in Mr. Adair's
conduct in connection with the bank or otherwise that
caused you to suspect either his ability or his honesty?
A. No, sir; not the least bit in the world.  *   *   *   I
didn't know anything about the loans made to Adair
or the Happy Hollow Tobacco Co. or the Postal Stores
Co., or Mary Richards, or Frank Greer. Q. Now what
did the board of directors do when they declared the
dividends? A. We had a statement drawn off; that was
what we took it from. His own statement and his own
word. Q. Did the board of directors, when these state-
ments were handed to them, examine any further into
the condition of the bank? A. Only by talking to Mr.
Adair, to the best of my recollection. Q. Did the board
of directors at any of these meetings go over all the
bills and notes of the bank, or compare them with the
books of the bank? A. Not to my recollection, we didn't.
Q. Did the board of directors ever count the cash on
hand? A. I have no recollection of it if they did."

L. P. Milner, a farmer, who had been a director of
the bank for some five years before it closed, said that
he had the utmost confidence in the integrity and busi-
ness ability of Adair; that he did not know anything
about the loans made to the Happy Hollow Tobacco Co.,
the Stores Co., or to Adair; that the directors did not
attempt to make any investigation or examination of
the affairs of the bank, but relied entirely upon what
Adair told them. He was also asked and answered the
following questions: "Q. You and the other directors
left the entire management of the bank to Adair? A.
Yes, sir; so far as I know, they did. I did. Q. Take
any part in the supervision of the loans that were made?
A. No, sir. Q. Never looked after the loans after they
were made? A. No, sir; I didn't. Q. Never made any
investigation to see to whom the bank was lending the

money? A. No, sir. Q. Nor how much it was lending any one person? A. No, sir. Q. Never called on Mr. Adair for any exhibition of the bills and notes that the bank carried at any time? A. No, sir. Q. Never made any investigation of the books of the bank to see what loans he was making? A. No, sir. Q. Never added up the bills and notes discounted to see whether or not they were correct and corresponded with the books of the bank? A. No, sir. Q. Never counted the cash on hand to see whether it compared with the books of the bank? A. No, sir. Q. All that the board of directors would do at the times that you were there would be to accept Mr. Adair's statement and declare dividends? A. Yes, sir. Q. All of the board of directors were considered capable, successful business men? A. Yes, sir; so far as I know they were.''

Dr. H. J. Lee, a practicing physician, who was a director during the life of the bank, after telling that the directors had the utmost confidence in the integrity and business ability of Adair, was asked and answered the following questions: ''Q. State whether or not the board of directors ever called on Mr. Adair to exhibit to them the bills and notes discounted, and whether the board of directors ever inspected these bills and notes and added them up to see what the assets of the bank consisted of? A. I don't think we did. Q. Did you ever at any time count the cash on hand or inspect the cash on hand? A. No, sir; never was done when I was there. Q. When these dividends were declared, they declared them on a statement furnished by Mr. Adair on the bank's condition? A. Yes, sir.''

R. D. Hamilton, another director during the whole time the bank was in business, after testifying to the confidence the directors had in the integrity and business ability of the cashier, said he did not know anything about the loans made to the Happy Hollow Tobacco Co., or the Postal Stores Co., or to Adair, or to others. He was also asked and answered these questions: ''Q. So far as you know, the board of directors never exercised any supervision over the loans made by Mr. Adair? A. No, sir; so far as I know they didn't. Q. Did the board ever make an inspection of the bills and notes to see whether or not he was living up to the rule that he must not lend over $500 without consulting the board? A. No, sir; never did in my presence. Q. Did

the board of directors ever inspect the bills and notes discounted to see who owed the bank and the amount? A. No, sir. Q. So far as you were concerned, and the rest of the directors, so far as you know, the matter of the handling of the funds of the bank and the supervision of its business was entrusted entirely to Adair? A. I think so; yes, sir. They thought that he was honest, and so did I.''

W. J. Hardin, a merchant, who had been a director of the bank since it commenced business, after testifying to his confidence in Adair, said that the board of directors never counted the cash or inspected the bills and notes, but left the entire management of the bank to Adair.

Summing up briefly the substance and effect of the evidence, it appears that while all of the directors were men of good business capacity, engaged in various kinds of business, none of them were bookkeepers or accountants, nor had any of them had experience in the banking business except in connection with this bank. In short, they were composed of that class of men who are generally selected as directors of country banks and who serve without compensation.

It further appears that all of them were honest men, having the most implicit confidence in the integrity and business ability of the cashier, and blindly accepted as truthful and correct every statement he made about the condtiion of the bank without making or attempting to make any examination of its affairs. They never counted the cash or looked at the accounts or examined the notes. In fact, they did not know anything whatever about the business of the bank or its condition independent of what they were told by the cashier. They declared good dividends regularly and regularly set apart to the surplus fund a substantial sum, when the earnings of the bank did not justify any dividends or leave any surplus.

It further appears that several insolvent parties, including the cashier, were permitted to borrow money from the bank without security in sums largely in excess of the statutory limit, and that this condition continuously existed for several years before the failure. The account of the cashier was almost continuously overdrawn in large amounts which were unsecured.

It further appears that the cashier did not make any false entries in his books or endeavor in any manner to manipulate the books or notes or records of the bank so that they would mislead or deceive any person who might inspect them. The books and records and notes of the bank at all times showed the true condition of its affairs, and the slightest inspection or examination of the notes or the account of Adair would have shown any of the directors that his account was overdrawn, and that he was lending large sums of money without security to insolvent people.

Turning now to the statute law on the subject of the liability of directors, it is provided in Section 583 of the Kentucky Statutes, in the article relating to banks and banking, that "No bank shall permit any of its stockholders, or any person, company or firm, including in the liability of the company or firm the liability of the individual members thereof, directly or indirectly, to become indebted to it in a sum exceeding twenty per cent. of its capital stock actually paid in, and its actual amount of surplus, unless such borrower pledge with it good collateral security, or execute to it a mortgage upon real or personal estate, which at the time is of more than the cash value of such loan or indebtedness above all other incumbrances; and if the borrower is a director or officer of such bank, he shall not be permitted to become indebted to it in excess of ten per cent. of its paid-up capital stock, without securing the excess by the mortgage or pledge of real or personal property double in value the amount of such excess; and in no event shall the indebtedness of any person, company or firm, including in the liability of the company or firm the liability of the individual members thereof, exceed thirty per cent. of its paid-up capital and actual surplus."

And in Section 596 that "The board of directors may declare a dividend of so much of the net profits of the bank, after deducting therefrom all expenses, losses, bad or suspended debts, interest and taxes accrued or due from the bank, as they may deem expedient; and all debts due to a bank on which interest is due and unpaid for six months, unless the same be well secured or in process of collection, shall be considered bad or suspended debts within the meaning of this section; but before any dividend is declared, not less than

one-tenth of the net profits of the bank for the period covered by the dividend shall be carried to a surplus fund until such surplus amounts to twenty per cent. of its capital stock.''

And in Section 598 that ''If any director or directors of any bank shall knowingly violate or permit any officer or employe of the bank to violate any of the provisions of the laws relating to banks, the directors so offending shall be jointly and severally individually liable to the creditors and stockholders for any loss or damage resulting from such violation; and if any such loss or damage be not made good within a reasonable time, it shall be the duty of the Secretary of State, with the consent of the Attorney General, to institute such proceedings as may be necessary to forfeit the charter of such bank.''

Section 548 of the Kentucky Statutes, a part of the general incorporation law, reads: ''If the directors of any incorporated company shall declare and pay any dividend when the corporation is insolvent, or any dividend the payment of which would render it insolvent, or which would diminish the amount of its capital stock, they shall be jointly and severally individually liable for all debts of the corporation then existing, and for all that shall be thereafter incurred while they, or a majority of them, continue in office.''

And Section 538 of the general law provides that ''Any number of persons, not less than three, may associate to establish a corporation for the transaction of any lawful business, or to promote or conduct any legitimate object or purpose under the provisions of, and subject to the requirements of, this article; but banking, building and loan, trust, insurance and railroad corporations shall, in addition to the provisions of this article, which are not inconsistent with the laws relating especially to them, be organized in the manner and subject to the provisions of such laws.''

The construction and relation to each other of Sections 538 and 548 of the general incorporation law, and Sections 596 and 598 of the banking law, was considered by this court in the case of City of Franklin v. Caldwell, 123 Ky., 528, and it was there held that the liability of bank directors who exercised ordinary care in the conduct of the affairs of the bank in declaring un-

authorized dividends should be limited to the restoration of the dividends so declared, the court saying:

"To fix the liability of directors of corporations by the strict letter of Section 548, and make them liable for all debts of the corporation, if they declare any dividend when it is insolvent, or which would render it insolvent, although in declaring the dividend they acted in good faith based on an honest belief in the correctness of the statements made by the cashier and other officers of the corporation, would be giving to this statute an interpretation not intended by the legislative department in its enactment. This section of the statute should be so construed as to limit the liability of directors to the amount of the dividend declared, when the facts show that in declaring it they have acted in good faith, and have used ordinary care and diligence in the conduct of the affairs of the institution. This section, when so construed, is not in conflict with, and should be read in connection with, Section 598. There is no reason why directors of banks should be held to a less accountability than the directors of other corporations. * * * The directors of banks are the only persons who can declare dividends, and Section 596, before quoted, provides when they may declare dividends; and if in violation of this statute a dividend is declared, the directors will not be permitted to shield themselves from liability upon the ground that they did not knowingly violate its provisions. It is the duty of bank directors to use ordinary care to acquaint themselves with the condition of the business of the bank, and to exercise reasonable control and supervision of its officers. That which they ought, by proper diligence, to have known, they will be presumed to have known in a contest between the corporation and those who do business with it, and have the right to believe that its directors have exercised ordinary care and prudence in the management of its affairs."

It is, however, insisted by counsel for the appealing depositors that the undisputed facts of this case show that the directors in declaring these dividends, and in the conduct of the affairs of the bank, did not exercise ordinary care, or any care, to inquire into the condition of its business, and it being admitted that the dividends were unlawfully declared, they should be made liable, under Section 548, *supra*, "for all debts of the corpora-

tion then existing, and for all that shall thereafter be incurred while they, or a majority of them, continue in office.''

On the other hand, counsel for the directors, while admitting that the directors violated Section 596 in declaring these dividends, urge that their liability should be limited to the restoration of the dividends so declared under Section 598, *supra,* providing that directors who violate any of the provisions of the law relating to banks ''shall be jointly and severally individually liable to the creditors for any loss or damage resulting from such violation.'' This argument is rested on the ground that when it appears, as in this case, that the directors of the bank were honest men and believed in good faith that the bank was solvent when the dividends were declared, their liability should be limited to the actual loss suffered by the creditors in taking from the assets of the bank the dividends so declared, as was adjudged by the lower court, following the rule laid down in the Caldwell case.

We would not have any difficulty in adopting this view if the directors had exercised ordinary care in the management of the affairs of the bank. When directors have exercised this measure of care, and in good faith have declared dividends that should not have been declared or paid, their liability should be limited to the restoration of the dividends so unlawfully declared. But here we are confronted with undisputed facts showing beyond question that if the directors had exercised ordinary care, or had made regular or even occasional investigations or examinations of the books or notes of the bank, or the accounts of the depositors, they could not have failed to discover the actual condition of the accounts and notes, and this would certainly have influenced them to take in time such action as would have saved the bank. But they did not do anything to correct the conditions that were bringing the bank to ruin, because they did not know of these conditions.

With this situation of affairs presented, there seems no escape from the conclusion that the provision in Section 548 of the statutes, making directors liable for all debts of the corporation when they declare and pay dividends if it is insolvent, must be applied to these directors, or else the statute must be declared to be a dead letter and without meaning. We said in the Cald-

well case that the letter of this statute would not be enforced against directors who exercised ordinary care, and this was giving to it a more favorable construction, to protect directors, than its literal meaning justified. But these directors cannot be saved by the application of the rule of ordinary care, for, as we have pointed out, they did not exercise any care. They were, in fact, grossly negligent in attending to their duties as directors. It is true these directors may have exercised ordinary care, or indeed a high degree of care, in selecting as cashier a competent, experienced man who had a good reputation for integrity; but the mere selection of an officer of this kind will not excuse directors from continuing to give some attention to the business of the institution; or, in other words, from, at all times, exercising ordinary care in its management.

It is, of course, hard that these directors should be made liable for all the debts of the bank, but, at the same time, it is hard that the depositors should lose their money, which it is fair to assume they would not have lost if the directors had exercised ordinary care. Directors of banks invite deposits. They solicit them. People make deposits in banks very largely in reliance on their knowledge of the character and business capacity of the officers and directors. They have a right to believe that the directors, who have full control of the management of the institution, will take such care of its affairs as men of ordinary prudence would exercise under similar circumstances and conditions to see that the business of the bank is conducted in a prudent manner. Persons who accept the office of directors in institutions like this assume the duty of giving to the affairs of the institution the care indicated, and if they do not and loss is occasioned, it is more just that they should bear this loss than that it should fall on innocent and helpless depositors. The measure of care demanded is not high, nor is it more care than men with such knowledge of banking and business affairs as these directors possessed should be required to exercise. A less degree of care than this is no care. It is, in fact, negligence of such a character as that it may be called gross, as manifesting a reckless disregard of the rights of the depositors. Jones v. Johnson, 86 Ky., 530; Savings Bank v. Caperton, 87 Ky., 306; Brannin v. Loving, 82 Ky., 370; Seale v. Baker, 70 Tex., 283, 8 A. S. R., 592; Briggs v.

Spaulding, 141 U. S., 132, 35 Law Ed., 662; Greenfield Savings Bank v. Abercrombie, 211 Mass., 252, 39 L. R. A. (N. S.), 173, A. & E. Ann. Cases, 1913 B., page 420; Bosworth v. Allen, 168 N. Y., 157, 55 L. R. A., 751; Morse on Banking, Vol. 1, Sections 128-130; Mitchie on Banks and Banking, Vol. 1, Section 53.

Another question that arises is, should the liability be confined to the directors who were present when the dividends were declared as shown by the records of the bank, or should all the directors of the bank be held liable for all of its debts?

Section 548, *supra,* does not limit the liability to the directors who are present and declare the dividend, and if those who are absent approve of the action of those who were present by accepting payment of the dividend so declared, it would seem that they should be held liable to the same extent as if they had attended the meeting and voted to declare the dividend. There is not much room for distinction between the attitude of a director who is present and votes to declare the dividend and that of the director who is absent, but who accepts and receives the dividend so declared. It is really the payment of the dividend, and not merely the declaration of it, that creates the liability and works the harm the statute was intended to prevent. The purpose of the law was to punish directors who took from the assets of the bank funds in the way of dividends that ought not to have been taken; and if directors, who do not attend the meeting at which the unlawful dividend is declared, afterwards receive it, they are equally as guilty of violating the law as those who declare it. Of course, a director who refuses to accept the dividend that had been declared would not come within the scope of the statute nor be liable under it.

But, in the case we have, it appears that all of the directors received the dividends that were declared, and, therefore, all of them are, as provided in the statute, jointly and severally individually liable for all the debts of the corporation.

In view of the fact that under our construction of the law as applied to the facts of this particular case, all the directors are liable for all the debts due the depositors, it is scarcely necessary to consider the other question made as to the liability of the directors for loans made in excess of the statutory limit, which were

lost by reason of the insolvency of the borrowers. The authorities, however, leave no room for doubt as to the liability of the directors who consent that funds in excess of the statutory limit may be loaned for the loss occasioned by the lending of the excess. Randolph v. Ballard County Bank, 142 Ky., 145; Allen v. Neale, 134 Ky., 690; City of Franklin v. Caldwell, 123 Ky., 528; Martin v. Webb, 110 U. S., 7, 28 L. R. A., 49.

The disposition made of the principal question also makes it unnecessary that we should extend this opinion in discussing the liability of Shellman on account of his negligence that operated to release the surety in the bond executed by the cashier further than to say that his gross negligence, as disclosed in this case and in the opinion of Bank of Hardinsburg v. American Bonding Co., 153 Ky., 579, shows that he should be held liable.

Wherefore, the judgment on the original appeal is reversed, with directions to enter a judgment against the directors for the full amount of the debts due the depositors. The directors, of course, will not be liable for dividends received in addition to their liability for the debts, and those directors who have restored the dividends received should have credit by the sums so paid when they come to satisfy the indebtedness. The judgment on the cross-appeal of Shellman is affirmed.