## Scott's Executors v. Young et al.

(Decided November 19, 1929.)

578

HOLT & HOLT and MATT J. HOLT for appellants.

PEAK & PEAK, BARRICKMAN & KALTENBACHER, TODD & BEARD, GILBERT & PICKETT, H. B. KINSOLVING, JR., and E. H. DAVIS for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

Annie Harbison Scott was the owner of 32 shares of the capital stock of the People's Bank & Trust Company of Shelbyville, which she had acquired at the average price of $140 a share prior to the year 1913. Due to the defalcations of its assistant cashier, O. H. Vardaman, aggregating $61,951.21, and covering a period of years, the bank became insolvent, and on the application of its directors was placed in charge of the state banking commissioner for liquidation. To meet the claims of depositors, Miss Scott was assessed $75 a share, which she paid. Thereupon she brought this suit against the president, cashier, and other directors, to recover $2,400, the amount of the assessment, and $4,450, the loss on the market value of the stock, the two items aggregating $6,850. After motions to make more specific were sustained, plaintiff filed an amended petition on which issue was joined. On motion of the defendants, the cause was transferred to equity. Proof was taken, and, on final hearing, the petition as amended was dismissed. From that judgment plaintiff has prosecuted an appeal. Af-

580

terwards plaintiff died, and by consent of parties the action has been revived in the name of her executors.

The first question presented is whether the court erred in transferring the cause to equity. The code permits a transfer to equity where the court is of the opinion that such transfer is necessary because of the peculiar questions involved, or because the case involves accounts so complicated, or such detail of facts, as to render it impracticable for a jury to intelligently try the case. Section 10, subsec. 4, Civil Code. It is true that nearly every issue involved the question whether defendants as officers and directors exercised ordinary care in the management of the bank, and, if the failure to exercise such care had been pleaded with respect to a few items, doubtless the transfer would not have been proper. But plaintiff not only sought a recovery on account of the shortage, the illegal declaration of dividends, the making of loans in excess of the statutory limit, and the receiving of 189 deposits, but went further and sought a recovery for the loss sustained on 81 overdrafts and 203 loans, all of which it is claimed was due to the negligence of the defendants. It will thus be seen that the pleadings presented a very large number of issues of fact, involving, besides other items, 81 separate and distinct overdrafts, and 203 separate and distinct loans, as to which it would have been necessary for the jury to hear evidence. In the circumstances we conclude that the case is one involving such detail of facts as to render it impracticable for a jury to intelligently try the case. Prussian National Insurance Co. of Stettin, Germany, v. Terrell, 142 Ky. 732, 135 S. W. 416. It follows that the court did not err in ordering the transfer.

This is not a case where the officers and directors profited from any of the transactions in question and only the rights of stockholders are involved. In such a case the officers and directors are not insurers, and all that the law requires is that they shall exercise ordinary care in the selection of the officers and agents of the bank, and in the management and supervision of its affairs. Cunningham v. Shellman, 164 Ky. 584, 175 S. W. 1045; Dunn v. Kyle, 14 Bush, 134; Briggs v. Spaulding, 141 U. S. 144, 11 S. Ct. 924, 35 L. Ed. 662. Ordinary care is such care as ordinarily prudent directors and officers usually exercise under similar circumstances and in like communities.

With these principles in mind let us examine the facts. The insolvency of the bank was due to the defalcations of Vardaman, the assistant cashier. We shall first determine whether the officers and directors exercised ordinary care in his appointment and retention. It is not claimed or even suggested that there was any negligence in his original appointment. On the contrary, the evidence clearly shows that he was a young man of good reputation and capacity, and the trusted employee of a bank at Bagdad. After his employment he and his family lived in an economical and unpretentious way. He was never known to drink or gamble, his habits were simple, and his clothing almost shabby. He was a deacon of the Baptist Church and a regular attendant. He was a member of the city council and served on its finance committee. The only claim is that Vardaman was engaged in buying oil stock, and that this was sufficient to put the directors on notice. It appears that several years ago he bought some oil stocks and was sent to Texas to look after the property. The wells proved to be dry and the venture unsuccessful. The amount involved was not large, and the proposition seems to have appealed to others, who were not wanting in business capacity. In view of Vardaman's habits and modest way of living, and of the further fact that the amount involved in the purchase of oil stocks was not large, and is not shown to have been connected in any way with his peculations, we hardly think that these transactions, though of a speculative nature, were sufficient to excite the belief on the part of the directors that Vardaman was then engaged, or probably thereafter would engage, in embezzling the bank's money. We therefore hold that the directors were not negligent in the appointment or retention of Vardaman.

Vardaman's defalcations began in the year 1921. For the first five years they averaged in amount from $2,750 to $6,400. Within a few months next preceding the insolvency, the defalcations amounted to $39,600. Besides Vardaman, there were three bookkeepers in the bank. Vardaman kept the accounts from A to G, inclusive, and all the shortage was in these accounts. His method was original and ingenious. When the day's work was balanced, each of the bookkeepers took his deposits and checks and added them on the machine. On any day that there was a shortage, the amount would be placed in the machine and the carriage thrown back,

thus the amount, though carried in the machine, was not printed on the paper tape. The result was that when they made a total every item was listed accurately on paper, but the grand total was in excess of the actual total by whatever amount was put in the machine at that time. The practice was at the close of the day's work to take the total of the checks and deposits and check that against the cash total. All three of the books would be added and compared with the register. If there was an error, which might occur in many ways, they checked back and would check promiscuously. They would have one person call the amounts and another to make a check on the slip. The machine slip would always check exactly with the amounts that were listed. In doing this Vardaman never checked or called his own work. The way that he concealed his peculations from the state bank examiners was this: The accounts on the loose-leaf ledger were properly kept so that if any depositor inquired for his balance the true balance was shown. The examiners usually went to other banks first, and, on learning of their presence in town, Vardaman would insert false leaves in the ledger so that the accounts would correspond with the cash on hand. Twice a year for a number of years he did this successfully, but on the last examination the examiners came first to the bank in which he was employed. When they called for his books, he announced that he was not ready, and for the first time began to make alterations and erasures in the books. Before completing the alterations, the books were demanded, with the result that the shortage was disclosed.

In this connection let us examine the steps taken by the officers and directors in the management and supervision of the bank's affairs. The record discloses that they were not figureheads, as is sometimes the case. On the contrary, they met in regular sesion on the 1st day of every month. They always had a quorum, and usually all the directors were present with the president and cashier. The minutes of the previous meeting were read. The notes taken since the last meeting were presented by the cashier, and then inspected and discussed. The past due paper was gone over, and collections by suit or renewal directed. The paper due the following month was also considered, and the cashier directed as to collections, renewals, or deductions. At the regular meetings on the first of July and the last of December the directors would go over the entire assets of the bank. The original notes

were taken out of the note pouch and added up on the machine. They then compared the notes with the amounts given on the machine tape, and would ascertain if the notes and the amount at the bottom tallied with the books. They also examined the surplus and the collateral attached to the notes, and would go over the bonds. In doing this they did not take the cashier's word, or the word of any one else, but had the paper on the table before them. At the close of business on that day they themselves counted the cash. To do this work required an entire day and sometimes two days. During all this time the bank was regularly examined twice a year by the state bank examiners. Notwithstanding their own investigation and that of the state bank examiners, the defalcations were not discovered.

Mr. Eskew, the expert accountant, Mr. Beard, the special deputy banking commissioner, and Mr. Phillips, the banking commissioner, who were acquainted with the facts and understood the situation, all gave it as their opinion that the average bank director could not have discovered the shortage by the exercise of ordinary care. Though Mr. Escott says that it could have been discovered by a complete audit made by an expert accountant, this practice is not followed by country banks, and, in view of the examination made by them and the state bank examiners, and of the further fact that there was nothing in the conduct or habits of Vardaman reasonably calculated to arouse their suspicion, we are not disposed to hold that the directors were guilty of negligence in failing to have such an audit made. Furthermore, it must not be overlooked that the directors and officers were themselves among the largest stockholders of the bank, and had their own interests to protect, as well as that of the other stockholders. Looking at the case from every angle, we are inclined to agree with the chancellor that the loss occasioned by the Vardaman shortage was not due to a failure on the part of the officers and directors to exercise ordinary care in the management and supervision of the bank.

One of the claims asserted is for dividends illegally declared. The basis of this claim is that, because of the Vardaman shortage, the dividends were paid, not out of earnings, but out of capital. The rights of creditors not being involved, the case does not fall under section 548, Kentucky Statutes. The suit is by a stockholder who has already received her share of the dividends in ques-

tion, and which she may be required to refund. Lexington Life, Fire & Marine Ins. Co. v. Page, 17 B. Mon. 412, 66 Am. Dec. 165; Grant v. Ross, 100 Ky. 44, 37 S. W. 263, 18 Ky. Law Rep. 597. Even if the dividends were illegally declared, and the circumstances were such as to impose liability upon the directors, all that she could recover is her pro rata share of the dividends paid, and, having already received this sum, she cannot compel the directors to pay it to her again. Emerson v. Gaither, 103 Md. 564, 64 A. 26, 8 L. R. A. (N. S.) 738, 7 Ann. Cas. 1114. In support of the claim of liability on the part of the directors, some stress is placed on the fact that they gave their notes to the bank in order that the last dividend might be paid. Not knowing that the capital had been impaired, the directors executed the notes. Though the money was not collectible until the January following, the accrued earnings were sufficient to meet the dividend had it not been for the shortage. In the circumstances it was good business judgment to declare the dividend, and the fact that the directors executed their notes to cover the earnings in process of collection adds in no way to their responsibility, but operates rather to show their good faith and confidence in the solvency of the bank.

With respect to liability predicated on the false statements of the bank's condition, the facts are these: Appellant did not purchase her stock from any of the directors, or from the bank itself on the faith of the statements. On the contrary, she acquired her stock many years before the statements were made. It is not perceived, therefore, how she lost anything by reason of the false statements. Manifestly, if the true condition of the bank had been shown in the statements, there would have been a corresponding depreciation in the market value of her stock. Aside from these considerations, directors who have not profited from the transaction are not liable to stockholders for losses growing out of false statements of the condition of the bank unless they knowingly cause the false statements to be published (section 549); and, though they are presumed to know all the facts which ordinary diligence would disclose, we have heretofore held that the directors were not negligent in failing to discover the shortage.

With respect to the recovery sought on account of loans claimed to have been made in excess of the statutory limit fixed by section 583, Kentucky Statutes, it is

sufficient to say that directors are personally liable only to the extent of the excess that is lost to the bank, and here no loss was shown. Section 583, Kentucky Statutes: Cunningham v. Shellman, supra; Emerson v. Gaither, supra.

Another contention is that the directors and officers were negligent in permitting Vardaman to borrow money with practically no security, and to overdraw in the sum of $182.94. The original indebtedness was about $2,700. Vardaman carried $1,000 insurance, and the note was secured by oil stock which afterwards proved worthless. Over a period of years the note was reduced to about $2,025. Mr. J. P. Morgan once stated in substance that in making a loan he considered character above everything else, and, as pointed out in Wallace v. Lincoln Savings Bank, 89 Tenn. 630, 15 S. W. 448, 24 Am. St. Rep. 625, moral character, business integrity, and thrift play no small part among business men in determining the soundness and prudence of a transaction. As Vardaman was a trusted employee of the bank with a salary of $160 a month, and was apparently a man of good character with habits of thrift and economy, we fail to find in the record such negligence as would impose upon the officers and directors any personal liability because of the loan and overdraft. In this connection we shall consider the claim that the cashier is liable because of loans made to his tenants. There was a failure to show that the proceeds of the loans were used by the tenants to discharge their obligations to the cashier, or that the cashier used the bank in any way for his own protection, or profited in the least from the transactions. On the contrary, the evidence discloses that the tenants were farmers, and the original loans were made when farmers were prosperous. Over a period of years the interest on the loans was kept paid and the notes were sometimes increased and then decreased. At the time of the hearing, there was a small balance due on one of the notes. Another of the notes was secured by a mortgage on real estate, while a third was secured by an insurance policy and a personal surety. If there should be a loss on these notes, it will not be large. Not only so, but the cashier was himself willing to extend credit, and did extend credit, to the same tenants. In the circumstances, it cannot be said that he acted in bad faith, or that he failed to exercise such care as an ordinarily prudent man would ex-

586

ercise in his own business. Pryse v. Farmers' Bank, 33 S. W. 532, 17 Ky. Law Rep. 1056.

The contention that the directors were liable because they employed a cashier who neglected the bank's business for his own business cannot be sustained. It is not unusual for a cashier of a country or small town bank to supplement his income by acting as agent for an insurance company. The evidence shows that the cashier of the bank in question devoted but little, if any, of his time to the insurance business during banking hours. On the contrary, he appears to have devoted all of his time to the bank, and to have been unusually attentive in looking after its affairs.

Another ground of liability is that the directors were negligent in not requiring of Vardaman a bond for a larger amount than $4,000. Subsequent developments have shown that it would have been better to require a larger bond, but the question is to be determined in the light of the customary amount of such bonds among banks in similar communities, and of the facts existing at the time the bond was executed. The uncontradicted evidence shows that it was about the same as that required by banks in similar communities, and, there being nothing in Vardaman's behavior to put the directors on inquiry we are not disposed to hold that they were negligent in not requiring a larger bond.

Another item on which a recovery is sought is an overdraft of the Armstrong Hotel in the sum of $2,500.19. Though this sum appears on the books as an overdraft, it is not an overdraft in fact. The evidence shows that the hotel was taken as security for a debt and purchased by the bank, and that the sum of $2,500.19 was expended in the operation of the hotel. The bank was authorized to hold the property for a period of five years, and the directors, believing in good faith that it would bring more as a going concern, advanced the above sum to continue it in operation. Whether or not in the circumstances the directors were authorized to expend money in the operation of the hotel we need not inquire. The evidence discloses that, when the property was finally disposed of, it brought enough to cover the mortgage debt and expense of operation. There being no loss on the transaction, the directors were not liable.

Other items are discussed, but, having reached the conclusion that the officers and directors exercised rea-

sonable care and diligence in looking after the affairs of the bank, it necessarily follows that they are not personally liable.

Judgment affirmed.

Whole court sitting.